UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MATTHEW LINGLEY and SANDY
PAPADOPOULOS, on behalf of themselves and
all others similarly situated,

Case No. 1:23-cv-05849-VM

                                    Plaintiffs,

v.                                                          ORAL ARGUMENT REQUESTED

SEEKING ALPHA, INC.

                                    Defendant.


**DEFENDANT SEEKING ALPHA, INC.'S MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page(s)**

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   SUMMARY OF RELEVANT FACTS AND ALLEGATIONS ......................................... 4

    A.    Seeking Alpha's Premium and Pro Services ........................................... 4

    B.    The Complaint .................................................................... 6

    C.    Pre-Motion Correspondence ......................................................... 6

III.  ARGUMENT ............................................................................ 7

    A.    Applicable Legal Standards ......................................................... 7

    B.    The Complaint Fails to State a Claim Under Any of the State Laws at Issue ........ 8

        1.    The IAA and Related State Laws................................................. 8

        2.    Plaintiffs Fail to Plausibly Allege a Right to Rescission Under Any
            Investment Advisory Statute ................................................... 8

            a)    Plaintiffs Fail to Allege the Existence of an Investment
                  Advisory Contract ........................................................ 9

            b)    Plaintiffs Fail to Allege That Seeking Alpha Is an "Investment
                  Adviser" ............................................................... 12

                (1)    *Seeking Alpha Is a Bona Fide Publisher* ......................... 13

                (2)    *Seeking Alpha's Offerings Are of Regular and General
                     Circulation* .................................................. 16

        3.    Plaintiffs Have No Cause of Action Under Any State Statute
            Regulating Investment Advisers ............................................... 17

            a)    Plaintiffs' Claims Could Only Be Brought Under New York
                  Law ................................................................... 18

            b)    No Private Right of Action Exists Under New York's Martin
                  Act ................................................................... 19

    C.    Plaintiffs Have No Standing to Sue on Behalf of Subscribers to Seeking
        Alpha Pro .......................................................................... 21

IV.   CONCLUSION .......................................................................... 21

15872377.3

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Allen v. WestPoint-Pepperell, Inc.*,
   945 F.2d 40 (2d Cir. 1991)........................................................................................................7

*Anwar v. Fairfield Greenwich Ltd.*,
   728 F. Supp. 2d 354 (S.D.N.Y. 2010)....................................................................................20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................................................7

*Bank Leumi USA v. Ehrlich*,
   98 F. Supp. 3d 637 (S.D.N.Y. 2015).....................................................................................11

*Bogart v. Shearson Lehman Bros., Inc.*,
   1993 WL 33643 (S.D.N.Y. Feb. 3, 1993)..............................................................................10

*Castellano v. Young & Rubicam, Inc.*,
   257 F.3d 171 (2d Cir. 2001)...................................................................................................19

*Chigirinskiy v. Panchenkova*,
   2015 WL 1454646 (S.D.N.Y. Mar. 31, 2015) .......................................................................18

*de Kwiatkowski v. Bear, Stearns & Co.*,
   306 F.3d 1293 (2d Cir. 2002)..................................................................................................9

*DeBlasio v. Merrill Lynch & Co.*,
   2009 WL 2242605 (S.D.N.Y. July 27, 2009) ...............................................................8, 9, 11

*Hall v. Paine, Webber, Jackson & Curtis, Inc.*,
   1984 WL 812 (S.D.N.Y. Aug. 27, 1984)...............................................................................12

*In re Apple REITs Litig.*,
   2015 WL 1345328 (E.D.N.Y. Mar. 25, 2015) ......................................................................11

*In re Citigroup Auction Rate Sec. Litig.*,
   700 F. Supp. 2d 294 (S.D.N.Y. 2009)...................................................................................21

*In re Del-Val Fin. Corp. Sec. Litig.*,
   868 F. Supp. 547 (S.D.N.Y. 1994) ........................................................................................21

*In re Rospatch Sec. Litig.*,
   1992 WL 226912 (W.D. Mich. July 8, 1992).......................................................................20

*In re Weiss Research*,
   Inv. Adv. Act Rel. No. 2525 ............................................................................................14, 15

## TABLE OF AUTHORITIES
<u>(continued)</u>

<u>Page(s)</u>

*Int'l Audiotext Network, Inc. v. AM. Tel & Tel. T Co.*,
  62 F.3d 69 (2d Cir. 1995)........................................................................................7

*Kassover v. UBS AG*,
  619 F. Supp. 2d 28 (S.D.N.Y. 2008)....................................................8, 9, 11, 12, 13

*KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*,
  2020 WL 7251172 (S.D.N.Y. June 29, 2020) .................................................2, 9

*Kohn v. Esposito*,
  2022 WL 10607914 (E.D.N.Y. Mar. 8, 2022) ...........................................................9

*Lowe v. S.E.C.*,
  472 U.S. 181 (1985)...................................................................................... *passim*

*Malon Res. Corp. v. Midland Bank*,
  1997 WL 403450 (S.D.N.Y. July 17, 1997) ..........................................................19

*Matusovsky v. Merrill Lynch*,
  186 F. Supp. 2d 397 (S.D.N.Y. 2002)....................................................................10

*Nexpoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*,
  620 F. Supp. 3d 36 (S.D.N.Y. 2022), *aff'd*, 80 F.4th 413 (2d Cir. 2023)................10

*People by Schneiderman v. Credit Suisse Sec. (USA) LLC*,
  107 N.E.3d 515 (N.Y. 2018).................................................................................20

*Pers. v. New York Post Corp.*,
  427 F. Supp. 1297 (E.D.N.Y.), *aff'd*, 573 F.2d 1294 (2d Cir. 1977)..................3, 17

*Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*,
  794 F. Supp. 1265 (S.D.N.Y. 1992).........................................................................9

*Rapillo v. Fingerhut*,
  2016 WL 11705140 (S.D.N.Y. Sept. 14, 2016).......................................................9

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007)....................................................................................7

*S.E.C. v. Park*,
  99 F. Supp. 2d 889 (N.D. Ill. 2000) ......................................................................15

*Townsley v. Airxcel, Inc.*,
  2018 WL 3946449 (S.D.N.Y. Aug. 15, 2018).......................................................18

iii

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
444 U.S. 11 (1979)......................................................................................1, 8, 20

*Verzani v. Costco Wholesale Corp.*,
641 F. Supp. 2d 291 (S.D.N.Y. 2009).........................................................7

*Welch v. TD Ameritrade Holding Corp.*,
2009 WL 2356131 (S.D.N.Y. July 27, 2009) ............................8, 10, 11

*Welsbach Elec. Corp. v. MasTec N. Am., Inc.*,
7 N.Y.3d 624, 859 N.E.2d 498 (N.Y. 2006) ............................18

### STATUTES

15 U.S.C.
§ 80b-2 ...............................................................................................2, 12
§ 80b-3a ...............................................................................................12

New York Gen. Bus. Law § 359-eee ...................................................17, 19

### OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6)...........................................................................7

15872377.3

Defendant Seeking Alpha, Inc. ("Seeking Alpha") respectfully submits this memorandum of law in support of its motion to dismiss the complaint (ECF No. 6, "Complaint") of Matthew Lingley and Sandy Papadopoulos, on behalf of themselves and all others similarly situated ("Plaintiffs").

## I.      PRELIMINARY STATEMENT

The federal Investment Advisers Act ("IAA") and related state statutes were enacted to regulate "the kind of fiduciary, person-to-person relationships ... that are characteristic of investment adviser-client relationships." *Lowe v. S.E.C.*, 472 U.S. 181, 210 (1985).  These statutes establish registration requirements for qualifying investment advisers, and prohibit deceptive acts.  If an individual or entity is required, but fails, to properly register under certain (but not all) of these statutes, their clients may have a "limited private remedy" to rescind their investment advisory contracts.  *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 24 (1979).

Seeking Alpha is not an investment adviser and not a fiduciary. Rather, it is a publisher of a widely circulated website offering news and analysis relating to finance and investing.  It offers various subscription packages, including "Premium" and "Pro," which give subscribers access to breaking financial news, market-related opinion and analysis, and stock tracking features. Hundreds of thousands of individuals subscribe to Premium and Pro.

Plaintiffs are subscribers to Seeking Alpha Premium.  In their Complaint, they allege that the Premium and Pro[1] subscription services render Seeking Alpha an investment adviser under the IAA and state statutes.  Plaintiffs make no allegation that Seeking Alpha has engaged in fraud or any other deceptive or misleading act.  Nonetheless, they seek rescission of contracts on

---

[1] The named Plaintiffs are not Seeking Alpha Pro subscribers, and appear to concede that they have no standing to bring claims on behalf of individuals who are Pro subscribers.

1

the purported basis that Seeking Alpha failed to register as an investment adviser under the various state statutes.  Plaintiffs' claims fail for multiple independent reasons.

First, Plaintiffs' rescission claim is necessarily premised on the existence of an investment advisory contract.  They must plausibly allege that Seeking Alpha and its subscribers entered into a contract that "was made illegally or requires illegal performance"; i.e., a contract establishing that Seeking Alpha will act as an investment adviser.  *KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*, 2020 WL 7251172, at *10 (S.D.N.Y. June 29, 2020) (Marrero, J.).  They cannot do this, because no such contract exists.  The only contract referred to in the Complaint is the "Terms of Use" ("TOU")[2] which cannot possibly be construed as an investment advisory agreement.  The TOU does not contemplate—let alone require—that Seeking Alpha will provide investment advisory services.  To the contrary, the TOU expressly states that Seeking Alpha does **not** provide investment advisory services or individualized advice, and warns subscribers to consult with their own financial advisers before investing.  Because no investment advisory agreement exists, there is no "illegal" contract to rescind, and Plaintiffs' claim fails.

Second, even if the requisite contract existed, the Complaint would fail because Plaintiffs cannot establish that Seeking Alpha qualifies as an investment adviser.  The IAA and all state investment advisory statutes exclude "publisher[s] of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation" from the definition of investment adviser.  15 U.S.C. § 80b-2.  Pursuant to this broad exclusion, publications that offer

---

[2] The TOU is attached to the Complaint as Exhibit A.  *See* ECF 6-1.  However, portions of that document are missing.  A complete and accurate version of the TOU, available on seekingalpha.com, is attached to the accompanying Declaration of Jacob D. Albertson dated October 17, 2023, as Exhibit A.

disinterested and truthful commentary to the general public are not subject to the IAA and related state laws.  Plaintiffs' allegations establish that this exclusion applies.  The Complaint demonstrates that Seeking Alpha's offerings are typical of financial publications that "are not meant to be subject to the [IAA]."  *Pers. v. New York Post Corp.*, 427 F. Supp. 1297, 1303 (E.D.N.Y.), *aff'd*, 573 F.2d 1294 (2d Cir. 1977).

The foregoing facts, independently or together, establish that Seeking Alpha cannot be liable under the IAA or any related state laws.  And, stepping back, it is clear why.  Seeking Alpha is a publisher that, Plaintiffs acknowledge, has hundreds of thousands of subscribers to its Premium and Pro services.  It does not personally know its hundreds of thousands of subscribers, their risk tolerance, their financial goals, their desired asset mix, the sources or amounts of their income or liabilities, or any other information that a fiduciary investment adviser would need in order to provide personalized investment advice.  To the contrary, as the TOU and Seeking Alpha's website carefully and repeatedly explain, Seeking Alpha does not (and could not) offer personalized investment advice.  And Plaintiffs offer no allegation to support a conclusion that any subscriber does or could reasonably believe otherwise.

But even setting the foregoing aside, the Complaint fails for a third, independent reason: Plaintiffs cannot establish that Seeking Alpha is subject to **any** statute that would permit recovery.  Plaintiffs concede that the federal IAA does not apply.  *See* ECF 23-1, p. 1.  They instead pursue their claim under the statutes regulating investment advisors in all 50 states and the District of Columbia.[3]  But **only New York's statute (the "Martin Act") could apply**.  The TOU requires that the entire "relationship between [subscribers] and Seeking Alpha," be governed by New York law.  TOU, p. 24.  This provision is broad enough to bar claims under

---

[3] These state securities laws are commonly referred to as "Blue Sky" laws.

other states' securities laws.  And the choice of New York law is certainly reasonable: Plaintiffs

allege that Seeking Alpha is registered to do business and has offices in New York.

Because only New York law applies, Plaintiffs can only succeed if they establish their

right of action under the Martin Act, which regulates investment advisors.  But Plaintiffs concede

that the New York statute does not expressly permit a private cause of action.  *See* Compl. ¶ 76.

And while Plaintiffs may argue that a cause of action for rescission can be inferred, nothing in

the statute or New York law permits such a conclusion.

Accordingly, and as discussed more fully below, Plaintiffs cannot establish the requisite

illegal contract; they cannot establish that Seeking Alpha meets the definition of investment

adviser; and they cannot establish that the one arguably applicable statute provides any right of

action.  The Complaint fails, and must be dismissed in its entirety, with prejudice.

## II.      SUMMARY OF RELEVANT FACTS AND ALLEGATIONS

### A.      Seeking Alpha's Premium and Pro Services

Seeking Alpha is the publisher of a web site located at https://seekingalpha.com.  TOU,

p. 1.  As stated on the first page of the TOU, Seeking Alpha provides its website and all related

services "subject to compliance with the terms and conditions" of the TOU.  *Id.*; *see also* Compl.

¶ 15.

Seeking Alpha offers two paid subscription services that are the subject of the Complaint:

Seeking Alpha Premium and Seeking Alpha Pro.  Compl. ¶ 20.  The features of these services

are summarized in the web page incorporated into the Complaint, and include:

- "Powerful screeners.  Use our cutting edge stock screeners to discover hidden gems."

- "Expert analysis.  See what the world's smartest analysts are saying about your stocks."

- "Portfolio tracker.  Keep track of your stocks & get 'Strong Buy' and 'Strong Sell' alerts."

- "Breaking news.  Keep your finger on the pulse with critical market updates – day and night."

- "Top stock picks.  Get 'Strong Buy' stocks from our market-beating Quant System."

- "Get educated.  Webinars, podcasts and articles to help you level up your investing."

Compl. ¶ 22.

Seeking Alpha makes the same information available to all Premium subscribers; however, as the Complaint notes, individual subscribers are free to decide which of that commonly-accessible information they wish to be provided.  *See id.* ¶ 34 (subscribers can add the stocks of their choosing to their dashboard to "stay connected to news and analysis"); *id.* ¶ 39 (stock screeners "help you discover great investment ideas."); *id.* ¶ 43 ("Key Stats Comparison enables [subscribers] to do a side-by-side comparison of essential stock information to assess opportunity.").

The TOU reinforces, and subscribers therein acknowledge, that Seeking Alpha provides no personalized investment advice.  For example, the TOU states:

- "You understand that **no content published on the Site constitutes a recommendation that any particular security, portfolio of securities, transaction or investment strategy is suitable for any specific person**."  TOU, p. 2 (emphasis added).

- "You further understand that **none of the bloggers, information providers, app providers, or their affiliates are advising you personally**."  *Id.* (emphasis added).

- The information provided by Seeking Alpha "is impersonal and **not tailored to the investment needs of any specific person**."  *Id.* (emphasis added).

- "**No recommendation or advice is being given as to whether any investment is suitable for a particular investor**."  *Id.* p. 4 (emphasis added).

- "Seeking Alpha is **not a fiduciary**...." *Id.* (emphasis added).

- "Seeking Alpha is **not** a licensed … **investment adviser**." *Id.* (emphasis added).

- "We strongly advise you to **discuss your investment options with your financial adviser** prior to making any investments, including whether any investment is suitable for your specific needs." *Id.* p. 23 (emphasis added).[4]

### B.    The Complaint

Plaintiff Matthew Lingley (a New York resident) and Sandy Papadopoulos (a Georgia resident) are subscribers to Seeking Alpha Premium (not Pro). *Id.* ¶¶ 16-17.  They purport to bring the Complaint on behalf of all subscribers to Seeking Alpha Premium and Pro.  The essence of Plaintiffs' Complaint is that Seeking Alpha is allegedly an investment adviser subject to state registration requirements. *Id.* ¶¶ 12-14.  Because Seeking Alpha is not registered as an investment adviser, Plaintiffs seek rescission of contract and a refund of the funds Seeking Alpha has received in exchange for its Premium and Pro services. *Id.* ¶ 14.

### C.    Pre-Motion Correspondence

On September 11, 2023, consistent with the Court's Individual Practices, Seeking Alpha sent a letter to Plaintiffs identifying certain deficiencies that Seeking Alpha believed provide a basis to dismiss the Complaint. *See* ECF 22-1.  On September 18, 2023, Plaintiffs responded with their own letter opposing dismissal. *See* ECF 23-1.  The parties were unable to resolve their dispute, and on September 20, 2023, Seeking Alpha sent a letter to the Court stating that the parties had failed to avoid motion practice. *See* ECF 24.

In an Order dated September 21, 2023, the Court requested that the parties advise whether they consented to the Court deeming the pre-motion letters as a fully briefed motion and

---

[4] *See generally id.* pp. 2-4, 23.

ruling on the basis of the letters, or requested supplemental or full briefing.  ECF 25.  By letter

dated September 28, 2023, Seeking Alpha advised that it consented to the Court deeming the

parties' letters as a fully briefed motion, but that Plaintiffs did not so consent and requested full

briefing.  ECF 26.  The parties proposed an agreed briefing schedule to be so-ordered in the

event the Court granted Plaintiffs' request for full briefing.  *Id.*

On October 3, 2023, the Court granted Plaintiffs' request for full briefing and adopted the

parties' proposed briefing schedule.  ECF 27.

## III.   ARGUMENT[5]

### A.   <u>Applicable Legal Standards</u>

The Court must dismiss a complaint, or any portion thereof, that fails to state a claim

upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6).  A complaint must be dismissed

pursuant to Federal Rule of Civil Procedure 12(b)(6) unless it provides sufficient facts that, if

"accepted as true, … 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court

also may consider "documents appended to the complaint or incorporated in the complaint by

reference," and "matters of which judicial notice may be taken."  *Allen v. WestPoint-Pepperell,*

*Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (citation omitted); *see also Roth v. Jennings*, 489 F.3d 499,

509 (2d Cir. 2007).  This includes the contract that forms the basis of a plaintiff's claims.  *Int'l*

*Audiotext Network, Inc. v. AM. Tel & Tel. T Co.,* 62 F.3d 69, 72 (2d Cir. 1995) (considering

agreement that is "integral to the complaint"); *see also Verzani v. Costco Wholesale Corp.*, 641

F. Supp. 2d 291, 297–98 (S.D.N.Y. 2009).

---

[5] Seeking Alpha hereby incorporates by reference its two pre-motion letters.  *See* ECF 22-1 &
ECF 24.

**B.      The Complaint Fails to State a Claim Under Any of the State Laws at Issue**

### 1.      The IAA and Related State Laws

Plaintiffs purport to bring their claim to void the TOU and for rescission under various state laws governing the registration of investment advisors, and not under the federal IAA.  ECF 23-1, p. 1.  However, Plaintiffs expressly allege in the Complaint that the applicable state laws are based upon the IAA.  Compl. ¶ 74.  Plaintiffs have also conceded that case law concerning the IAA governs the interpretation of the state law claims.  ECF 23-1, p. 1.  While the general principles limiting the applicability of federal IAA claims apply universally, certain features of the various state law claims further limit their scope.  Accordingly, Seeking Alpha addresses below the relevant law interpreting the IAA, except when addressing specific state laws.

### 2.      Plaintiffs Fail to Plausibly Allege a Right to Rescission Under Any Investment Advisory Statute

In *TAMA*, 444 U.S. at 24, the Supreme Court recognized the "limited private remedy" to void a contract under the IAA.  To sustain such a claim, a plaintiff bears the burden to plead **both** that: (1) he "entered into a contract for investment advisory services"; **and** (2) the defendant is an "investment adviser" under the IAA.  *DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605, at *16 (S.D.N.Y. July 27, 2009) ("In order to maintain a private action under section 215 of the IAA, a plaintiff must allege that he or she entered into a contract for investment advisory services with an investment adviser."); *see also Welch v. TD Ameritrade Holding Corp.*, 2009 WL 2356131, at *5 (S.D.N.Y. July 27, 2009) (same); *Kassover v. UBS AG*, 619 F. Supp. 2d 28, 32 (S.D.N.Y. 2008) ("Courts have required plaintiffs to allege that the parties entered into an investment advisory contract in order for the Advisers Act to apply.").

Plaintiffs fail to satisfy both of these pleading requirements; indeed, Plaintiffs satisfy neither.

a)      Plaintiffs Fail to Allege the Existence of an Investment Advisory Contract

"[F]or the [IAA] to apply, the parties must have entered into an investment advisory agreement."  *Rapillo v. Fingerhut*, 2016 WL 11705140, at *10 (S.D.N.Y. Sept. 14, 2016); *see also de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1309-10 (2d Cir. 2002) (firm that "did not ... contract to serve in an advisory capacity ... thus (undisputedly) was n[ot] an 'investment adviser'"); *Kassover*, 619 F. Supp. 2d at 32 (dismissing claim where "Plaintiffs have not pointed to any facts supporting their allegation that they entered into contracts for UBS FS to provide them with investment advice").  Plaintiffs must allege that the subject contract "was made illegally or requires illegal performance."  *KDH Consulting Grp.*, 2020 WL 7251172, at *10 (dismissing IAA claim).  This is consistent with the more general principle that "only unlawful *contracts* may be rescinded, not unlawful *transactions* made pursuant to lawful contracts."  *Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992) (emphasis in original; citation omitted); *see also Kohn v. Esposito*, 2022 WL 10607914, at *1 (E.D.N.Y. Mar. 8, 2022) ("a claim for rescission necessarily presumes the existence of a contract").

To determine whether an investment advisory contract exists, courts review the language of the subject contract to ascertain whether the defendant contracted to provide investment advisory services.  *Kassover*, 619 F. Supp. 2d at 32-33 ("the contracts Plaintiffs entered into and the only ones referred to in the Amended Complaint" are "properly considered in a motion to dismiss"); *DeBlasio*, 2009 WL 2242605, at *17.  The only contract cited or referred to in the Complaint is the TOU.  *See* Compl. ¶ 15 ("Defendants' website contains 'terms of use' that

purport to function as a contract between Defendant and the users of its website and its Premium Services."). On its face, **the TOU is not an investment advisory contract**. It does not require Seeking Alpha to provide investment advisory services. Plaintiffs identify no provision to the contrary. Since the TOU "can by its terms be performed lawfully, it will be treated as legal, even if performed in an illegal manner." *Nexpoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 620 F. Supp. 3d 36, 44 (S.D.N.Y. 2022), *aff'd*, 80 F.4th 413 (2d Cir. 2023).[6] Plaintiffs' claim fails on this basis alone. *Welch*, 2009 WL 2356131, at *5 (dismissing IAA claim where "the Complaint does not support an inference that there was an investment advisory contract between Plaintiff and TD Ameritrade"); *Bogart v. Shearson Lehman Bros., Inc.*, 1993 WL 33643, at *3 (S.D.N.Y. Feb. 3, 1993) (dismissing complaint where "plaintiff does not allege that he and [the defendant] entered into an 'investment advisory contract'").

Even assuming *arguendo* Plaintiffs had alleged that the TOU was an investment advisory contract, the claim would still be deficient, as allegations contradicted by exhibits to a complaint "are insufficient to defeat a motion to dismiss." *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002). Again, nothing in the TOU suggests that it is an investment advisory contract. In fact, the TOU **expressly and repeatedly disclaims** any investment advisory services, **warns subscribers that they are responsible** for their own investment decisions, and strongly encourages subscribers "to discuss [their] investment options with [their] financial adviser." *See supra* § II.A.

Courts in the Southern District, presented with similar language in the context of private claims for rescission under the IAA **at the motion to dismiss stage**, have expressly held that such disclaimers and warnings compel a finding that no investment advisory relationship exists.

---

[6] To be clear, Seeking Alpha has not performed any contract in an illegal manner.

*See, e.g.*, *DeBlasio*, 2009 WL 2242605, at *17-18 (dismissing IAA claim where contracts stated that the accounts were "not an advisory account" and "warned Plaintiffs that they should do their own research and seek additional advice if necessary"); *Welch*, 2009 WL 2356131, at *5 (same); *Kassover*, 619 F. Supp. 2d at 32-33 (dismissing IAA claim where contract stated that it was a "brokerage" account "except when executed in connection with opening an advisory account," which plaintiff had not done); *Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637, 660 (S.D.N.Y. 2015) (dismissing IAA claim where "the Agreement ... plainly disclaimed the provision of any such investment advice"). Here, where the TOU "plainly disclaimed the provision of any such investment advice," Plaintiffs cannot plausibly contend that the TOU created an investment advisory relationship. *Bank Leumi*, 98 F. Supp. 3d at 660.

In their pre-motion letter (ECF 23-1), Plaintiffs argued that the TOU's disclaimers should have no legal effect. But Plaintiffs cited cases concerning **fraud claims** under the Exchange Act, which reject "waiver" as a defense to fraud under certain circumstances. These cases have no bearing on Plaintiffs claims, which allege no fraud. Moreover, Plaintiffs' argument mistakes the law. Seeking Alpha does not argue that Plaintiffs have "waived" their claim based on the TOU language. Rather, the TOU language, including its express disclaimers, necessarily defeats any allegation that an investment advisory contract existed. *See DeBlasio*, *Kassover*, *Bank Leumi*, *supra*; *see also In re Apple REITs Litig.*, 2015 WL 1345328, at *5 (E.D.N.Y. Mar. 25, 2015) ("No fiduciary duty is owed where explicit contractual disclaimers of fiduciary duty apply." (citing *Cooper v. Parsky*, 140 F.3d 433, 439 (2d Cir.1998)). And because no such contract exists, there is no contract to rescind, and Plaintiffs have no private right of action.

11

   b) <u>Plaintiffs Fail to Allege That Seeking Alpha Is an "Investment Adviser"</u>

In addition to the requisite contract, a plaintiff must plead that the defendant is an "investment adviser."  Relevant here, the IAA states that an "investment adviser" "**does not include** ... **the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation**." 15 U.S.C. § 80b-2 (emphasis added).  Publishers who meet these criteria (the "Publishers Exclusion") are excluded from the IAA's reach.  The Publisher's Exclusion applies to the definition of Investment Adviser in all state investment advisor laws.  15 U.S.C.A. § 80b-3a ("No law of any State or political subdivision thereof requiring the registration, licensing, or qualification as an investment adviser ... shall apply to any person ... [who is] excepted from the definition of an investment adviser under section 80b-2(a)(11) of this title").[7]

The Publishers Exclusion "uses extremely broad language that encompasses any newspaper, business publication, or financial publication provided that two conditions are met." *Lowe*, 472 U.S. at 206.  To qualify, such a publication must only be: (1) "bona fide"; and (2) "of regular and general circulation."  *Id.*

As part of its burden to state a claim in this context, a plaintiff must plead that the defendant **is not excluded from the definition** of "investment adviser" pursuant to an express exclusion.  *Kassover*, 619 F. Supp. 2d at 33 ("Even if Plaintiffs had sufficiently pled [the existence of] an investment advisory agreement ..., Plaintiffs fail to adequately plead that UBS FS does not fall within the broker-dealer exemption from this definition."); *Hall v. Paine,*

---

[7] Section 80b-2(a)(11), in turn, codifies the Publishers' Exclusion. While this and other exclusions must be incorporated into state securities laws, federal law does not prevent a state securities law from being narrower than federal securities laws (i.e., further limiting the scope of investment advisor regulations).

*Webber, Jackson & Curtis, Inc.*, 1984 WL 812, at *2 (S.D.N.Y. Aug. 27, 1984) (dismissing IAA claim where plaintiff "made no allegation" that the defendants did not meet the criteria for the applicable exclusion).  Plaintiffs failed to satisfy this pleading burden.

### (1)   Seeking Alpha Is a Bona Fide Publisher

A **"bona fide" publication** is one that "contain[s] disinterested commentary and analysis as opposed to promotional material disseminated by a 'tout.'"  *Lowe*, 472 U.S. at 206.  In analyzing this requirement, courts consider whether the publications "contained any false or misleading information" or "were designed to tout any security in which [the publisher] had an interest," and whether the defendant had any "authority over the funds of subscribers.  *Id.* at 209, 210 n.57.

Plaintiffs do not allege that Seeking Alpha was interested in any transaction, made false or misleading statements, or exerted authority over its subscribers' funds.  *See generally* Compl.[8]

Plaintiffs allege that Seeking Alpha offers ratings and recommendations of stocks.  But it is settled that "[t]he mere fact that a publication contains advice and comment about specific securities does not give it the personalized character that identifies a professional investment adviser."  *Lowe*, 472 U.S. at 208; *see also Kassover*, 619 F. Supp. 2d at 33 ("that [defendants] recommended Plaintiffs invest in ARS is insufficient to infer an investment advisory agreement").

Plaintiffs also allege that Seeking Alpha provides "personalized" services, but their allegations are belied by the web page excerpts pasted into the Complaint and the TOU.  All of

---

[8] Without defining the term, Plaintiffs allege that Seeking Alpha "touts" its recommendations, perhaps in an effort to allude to the type of behavior that the IAA is meant to prevent.  However, the allegations in the Complaint (or lack thereof) belie any suggestion that Seeking Alpha is a "tout" in the sense the term is used in *Lowe*.  Plaintiffs nowhere allege that Seeking Alpha "tout[s] any security **in which [it] had an interest**."  *Lowe*, 472 U.S. at 209 (emphasis added).

15872377.3

the supposedly "personalized" services are simply features of the publication, equally available to all Premium subscribers, that allow subscribers to tailor the universally available information they receive from the site so that they can make their own investment decisions.  *See, e.g.*, Compl. ¶ 22 (screenshot describing features).  Plaintiffs place particular emphasis on the fact that subscribers can create a custom set of alerts relating to certain companies or stocks.  But this is not **personalized investment advice.**  The content itself is no different for any Premium subscriber; Seeking Alpha does not tailor the content to any subscriber's particular financial situation or goals.  Rather, it is simply a feature allowing subscribers to more easily access content relating to issues of interest to them rather than getting flooded with information about companies and stocks that are of no interest to the subscribers.

The information available to Seeking Alpha Premium and Pro subscribers is no different than the information offered by the publication in *Lowe* (which fit squarely within the Publishers Exclusion), namely: "general commentary about the securities ... markets, reviews of market indicators and investment strategies, and specific recommendations for buying, selling, or holding stocks."  *Lowe*, 472 U.S. at 185.  The fact that individual subscribers can select the information they receive—e.g., by creating a set of alerts relating to companies they want to follow, so that subscribers can "easily track and compare ratings" for those specific companies (ECF 6-2, p. 5)—does not mean that Seeking Alpha is rendering personalized investment advice.

In their pre-motion letter, Plaintiffs cite two cases allegedly supporting a conclusion that Seeking Alpha is not "bona fide."  In fact, these two cases are counter-examples demonstrating why Seeking Alpha **is** bona fide.

In *In re Weiss Research*, the SEC Commission found that the defendant ran an "auto-trading program" in which it "effectively had investment discretion to purchase and sell

14

securities on behalf of its auto-trading subscribers," and misled its clients.  Inv. Adv. Act Rel.

No. 2525 (available at https://www.sec.gov/files/litigation/admin/2006/ia-2525.pdf), pp. 5-6.

"Auto-trading was an arrangement in which premium services subscribers requested that Weiss

Research send trading instructions directly to their broker-dealers for automatic execution." *Id.*

p. 3.  "According to Weiss Research, auto-trading 'eliminate[d] the need for subscribers to

manually review and communicate orders to their broker." *Id.* p. 3.  The Commission further

noted that Weiss Research's promotional materials "selectively highlighted profitable trades,

omitted specific references to unprofitable trades, and presented an unrealistic picture of Weiss

Research's investment success." *Id.* p. 4.  Weiss Research also represented that customers

"would receive expert trading advice" from a certain investing expert, who was not in fact

involved.  *Id.* p. 4.  In light of all these facts, the Commission concluded that "Weiss Research's

auto-trading program did not qualify for the publishers' exclusion." *Id.* pp. 5-6.

      In *S.E.C. v. Park*, the SEC alleged the defendant "would purportedly encourage members

to buy shares of certain stocks, which he also already owned, in order to inflate the price, and

then he would reap the benefit by selling his shares profitably."  99 F. Supp. 2d 889, 892 (N.D.

Ill. 2000).  The SEC also alleged that the defendant "disseminated false and misleading

information regarding certain stocks to its subscribers in order to inflate prices." *Id.* p. 900.

Because the defendants were allegedly "acting as 'touts,' by promoting stocks in which they

either had an interest or for which they were being paid to recommend without revealing their

interests," the court concluded that they did not fit within the Publishers' Exclusion.  *Id.* at 895.

      These cases stand for the proposition that the Publishers' Exclusion does not apply to

defendants who are alleged to have misled subscribers, touted securities in which they had an

interest, and exerted authority over subscribers' funds.  That proposition is entirely consistent with

*Lowe*.  *See Lowe*, 472 U.S. at 209, 210 n.57 (in analyzing whether publication is "bona fide," courts consider whether it contained misleading information or was "designed to tout any security in which [it] had an interest," and whether the defendant had any "authority over the funds of subscribers").

By contrast, **no such allegations have been or could be made about Seeking Alpha**. These cases are therefore inapposite, and in fact only further support the conclusion that the Publishers' Exclusion applies here.

*(2)*     *Seeking Alpha's Offerings Are of Regular and General Circulation*

To be **"of regular and general circulation,"** a publication need only be "regular" in the sense that it is not "issued from time to time in response to episodic market activities," and "general" in the sense that it "circulate[s] for sale to the public at large."  *Id.* at 206 & n.51, 208.

Here, again, Plaintiffs fail to allege facts to establish that this prong of the exclusion is not satisfied.  The requirement of "regular and general circulation" is meant to "differentiate 'hit and run tipsters' and 'touts' from genuine publishers."  *Lowe*, 427 U.S. at 206.  The allegations Plaintiffs cite (in their pre-motion letter) as purportedly demonstrating irregular circulation show that Seeking Alpha's offering are **updated daily**, made **available for subscribers to read at any time**, and offer **breaking news**.  *See* Compl. ¶ 22 ("Breaking news" is updated "day and night"); ¶ 31 (recommendations are "reviewed each day"); ¶ 34 (subscribers can "stay connected to news and analysis")[9]; ¶ 37 (ratings are updated on the website); ¶ 41 (subscribers can create

---

[9] The fact that Seeking Alpha's subscribers can **access** the Premium material at any time they wish does not render its circulation irregular.  This is no different than a NY Times subscriber choosing to pick up or read an article in the newspaper (or visit the website) at any time they want.  A reader's ability to control when they read an article does not change the fact that it is "regularly scheduled."

16

their own screeners); ¶ 45 (subscribers can create custom comparisons).  This is precisely the kind of publication that the Publishers Exclusion was created to protect.

Congress, in enacting the IAA, was concerned with regulating "the kind of fiduciary, person-to-person relationships ... that are characteristic of investment adviser-client relationships." *Lowe*, 472 U.S. at 210.  "It is significant that the Act repeatedly refers to 'clients,' not 'subscribers.'"  *Id.* at 208 n.54.  Tellingly, Plaintiffs (correctly) refer to Seeking Alpha's "subscribers" 23 times, and its supposed "clients" just 3 times.  *See generally* Compl. Seeking Alpha's publications are "entirely impersonal," and concern only "nonfraudulent information in a regularly scheduled periodical of general circulation." *Lowe*, 472 U.S. at 210, 201 n.45.[10]  Publications like these "are not meant to be subject to the [IAA] and no amount of casuistic ratiocination can make it otherwise." *Pers.*, 427 F. Supp. at 1303.  Simply put, none of Plaintiffs' allegations come close to establishing "the kind of fiduciary, person-to-person relationships ... that are characteristic of investment adviser-client relationships." *Lowe*, 472 U.S. at 210.  The Publishers Exclusion applies, and the Complaint fails.[11]

### 3.    Plaintiffs Have No Cause of Action Under Any State Statute Regulating Investment Advisers

The foregoing analysis mandates dismissal of Plaintiffs' claims under any statute governing the registration of investment advisers.  But even if this were not the case, Plaintiffs' claim would still fail.  As a matter of law, Plaintiffs are limited to bringing their claim under the

---

[10] If Plaintiffs were correct, the Publishers Exclusion would be inapplicable to virtually all publishers of financial news and analysis—the NY Times, Apple News, Motley Fool, Yahoo! Finance, and the Wall Street Journal, to name a few.

[11] While no state statute imposes a narrower definition of the Publisher's Exclusion, certain states, including New York, define the Publisher's Exclusion more broadly than the federal IAA. Specifically, the Martin Act does not require that publications be of "regular and general circulation" in order for the exclusion to apply.  *See* N.Y. Gen. Bus. Law § 359-eee (excluding, from the definition of "investment adviser," any "publisher of any bona fide newspaper or news magazine," without requiring it be of "regular and general circulation").

Martin Act, and cannot invoke the laws of the other 49 states and the District of Columbia in this action.  And under relevant New York law, no private right of action for rescission exists.

> a)    Plaintiffs' Claims Could Only Be Brought Under New York Law

The TOU contains an express choice of law provision, which states that:

> The TOU, privacy policy **and the relationship between you and Seeking Alpha** are governed by and construed in accordance with the laws of the State of New York, without regard to its principles of conflict of laws.

TOU, p. 24.

New York courts will generally "enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or to the transaction." *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 629, 859 N.E.2d 498, 500 (N.Y. 2006) (citation omitted). Certainly, here, there is such a reasonable relationship.  As Plaintiffs allege, Seeking Alpha is registered to do business, has an office in, and regularly conducts business in person in New York.  Compl. ¶¶ 15, 19; *see also* TOU p. 16 (requiring notices to be sent to Seeking Alpha in New York).

This choice of law provision, which expressly covers the entire "relationship between [customers] and Seeking Alpha," is broad enough to encompass Plaintiffs' claim.  Where "the express language of the choice-of-law provision is sufficiently broad as to encompass the entire relationship between the contracting parties," it extends beyond claims sounding in contract. *Chigirinskiy v. Panchenkova*, 2015 WL 1454646, at *6 (S.D.N.Y. Mar. 31, 2015) (citation omitted).  Specifically, courts have held that broad choice of law provisions require dismissal of claims under Blue Sky laws of states other than the chosen state.  *See, e.g.*, *Townsley v. Airxcel, Inc.*, 2018 WL 3946449, at *7 (S.D.N.Y. Aug. 15, 2018) ("In light of the New York choice of law provision, plaintiff's claim under the Texas Securities Act ('TSA') fails. As part of the SPA,

the parties agreed that the subject matter of the contract would be governed by New York law. The TSA is a claim brought under Texas law; New York law does not include the TSA."); *Malon Res. Corp. v. Midland Bank*, 1997 WL 403450, at *2–3 (S.D.N.Y. July 17, 1997) (dismissing Colorado Blue Sky claim based on New York choice of law clause in the relevant agreement) (citing *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 310 (2d Cir. 1994)).

Accordingly, as a matter of law, Plaintiffs may only seek the remedies in the Complaint pursuant to the New York's investment advisers statute.

> b)   No Private Right of Action Exists Under New York's Martin Act

Because only New York law applies, Plaintiffs can prevail only if their Complaint is properly grounded in the Martin Act.  For the reasons discussed *supra* Section B.2., a claim under the New York statute would be barred for the same reasons it would be barred under any federal or state investment advisers act.[12]  But Plaintiffs' claim under the Martin Act fails for the additional reason that the statute provides no private cause of action for violation of its registration requirement.

Section 359-eee of New York's General Business Law requires the registration of entities that qualify as "investment advisers" pursuant thereto.  N.Y. Gen. Bus. Law § 359-eee. However, as Plaintiffs concede, this statute does not expressly authorize a private right of action. *See* Compl. ¶ 76 (purporting to list the jurisdictions that have adopted an express statutory cause of action; New York is not included).  And "[t]he New York Court of Appeals has held that there is no implied private right of action under the Martin Act." *Castellano v. Young & Rubicam,*

---

[12] Indeed, as noted in footnote 11, *supra*, the New York Publishers' Exclusion applies even more broadly than the federal IAA's version of that exclusion, as it does not require that qualifying publications be of "regular" or "general" circulation.

*Inc.*, 257 F.3d 171, 190 (2d Cir. 2001) (citing *CPC Int'l Inc. v. McKesson Corp.*, 514 N.E.2d 116, 118 (N.Y. 1987)).[13]

Accordingly, there is no basis to conclude that a private right of action exists to rescind a contract for failure to register as an investment adviser under the Martin Act.  As no private right of action exists, the Complaint must be dismissed.  *See In re Rospatch Sec. Litig.*, 1992 WL 226912, at *15 (W.D. Mich. July 8, 1992) (court dismissed claim under Florida Blue Sky law because Michigan law applied, and since "Michigan's Blue Sky Law does not authorize a private right of action, ... the court's decision on choice of law negates plaintiffs' Blue Sky claims").

Plaintiffs may argue, based on their reference to a purported right of action under "common law" (Compl. ¶ 74), that they have a right to rescission under New York common law. Again, there is no basis for such a claim.  First, a common law claim premised on failure to register under the Martin Act would unquestionably be an improper back-door Martin Act claim, which courts prohibit.  *People by Schneiderman v. Credit Suisse Sec. (USA) LLC*, 107 N.E.3d 515, 520 (N.Y. 2018) ("a private litigant may not pursue a common-law cause of action where the claim is predicated solely on a violation of the Martin Act or its implementing regulations *and would not exist but for the statute*") (emphasis in the original).[14]  But even if it were not

---

[13] Plaintiffs appear to take the position that the U.S. Supreme Court's analysis in *TAMA* authorizes an implied private right of action.  That position cannot be maintained in light of *CPC International*.  Moreover, the *TAMA* Court found an implied right of action based on language of the IAA that "contracts whose formation or performance would violate the Act 'shall be void . . . as regards the rights of' the violator." *TAMA*, 444 U.S. at 15-19 (citing 15 U.S.C. § 80b–15). No such language regarding "voidness" exists in the Martin Act.

[14] This conclusion is consistent with this Court's decision in *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 354 (S.D.N.Y. 2010), which rejected arguments for broad preclusive effect of the Martin Act.  As the Court noted, in quoting the New York Attorney General with approval, "the Martin Act 'does not preempt common-law remedies **whose source is independent of the statute**.'" *Id.* at 367 (emphasis added).  Here, Plaintiffs' claim cannot be disentangled from the Martin Act's registration requirements.

15872377.3

preempted, the claim would still fail.  Under New York law, "[r]escission is permitted where there is fraud or duress in the inducement of the contract, failure of consideration, inability to perform, or a breach of the contract so substantial that it defeats the object of the parties in making the contract."  *In re Del-Val Fin. Corp. Sec. Litig.*, 868 F. Supp. 547, 565 (S.D.N.Y. 1994).  As Plaintiffs have made no such allegations, there is no claim for common law rescission.

C.     **Plaintiffs Have No Standing to Sue on Behalf of Subscribers to Seeking Alpha Pro**

Plaintiffs purport to bring a claim on behalf of Seeking Alpha Premium **and** Seeking Alpha Pro subscribers.  Compl. ¶¶ 2, 49.  But Plaintiffs, who are not Seeking Alpha Pro subscribers, *id.* ¶ 16 & 17, lack standing to bring claims relating to Seeking Alpha Pro.  *See In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 308–09 (S.D.N.Y. 2009).  In their pre-motion letter, Plaintiffs failed to respond to this argument, and thus appear to concede this issue. In the event the Court does not dismiss the Complaint in its entirety, Plaintiffs' purported claim on behalf of Pro subscribers must be dismissed.

IV.     **CONCLUSION**

Plaintiffs' Complaint fails for at least three dispositive, independent reasons: (1) Plaintiffs fail to plausibly allege the requisite existence of an illegal investment advisory contract, so there is simply no contract to rescind; (2) Plaintiffs fail to plausibly allege that Seeking Alpha is an investment adviser, as Seeking Alpha falls squarely within the Publishers' Exclusion; and (3) the only law that could apply to Plaintiffs' claims – the New York Martin Act – offers no express or

21

implied private cause of action.  For the foregoing reasons, the Court should grant Seeking

Alpha's motion to dismiss the Complaint in its entirety, with prejudice.

DATED:  New York, New York
            October 17, 2023

Respectfully submitted,

MITCHELL SILBERBERG & KNUPP LLP

By: <u>*/s/ Jacob D. Albertson*</u>
     Jacob D. Albertson (j1a@msk.com)
     Eleanor M. Lackman (eml@msk.com)
     437 Madison Ave., 25th Floor
     New York, New York 10017-1028
     Telephone: (212) 509-3900
     Facsimile: (212) 509-7239

     Kevin E. Gaut (keg@msk.com)
     (*admitted pro hac vice*)
     2049 Century Park East, 18th Floor
     Los Angeles, CA 90067
     Tel: (310) 312-2000
     Fax: (310) 312-3100

     *Attorneys for Defendant Seeking Alpha,*
     *Inc.*

22