# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MATTHEW LINGLEY and SANDY
PAPADAPOLOUS, on behalf of
themselves and all others similarly
situated,

      Plaintiffs,

v.

SEEKING ALPHA, INC.,

      Defendant.

Civil Action No. 1:23-cv-5849-VM

# PLAINTIFFS' BRIEF IN OPPOSITION TO
# DEFENDANT'S MOTION TO DISMISS

# TABLE OF CONTENTS

Introduction ................................................................................................. 1

Background ................................................................................................. 2

Legal Standard ........................................................................................... 4

Argument .................................................................................................... 5

    I.   Seeking Alpha provides investment advice without registering and any
        agreement, including the Terms of Use, are therefore void. ........................... 5

       A.  Seeking Alpha's "Motion to Dismiss" turns on disputed issues of
           fact and information beyond the face of the Complaint. ............................. 5

       B.  Seeking Alpha contracted to provide investment advice to its
           subscribers in exchange for fees. ................................................................ 6

       C.  Seeking Alpha is not a bona fide publisher. ................................................ 11

    II.  In addition to being void as part of an unlawful agreement, the Terms
        of Use are unenforceable browsewrap. ........................................................ 14

    III.  Rescission is an available and appropriate remedy under New York
         law to the extent it applies in this case. ...................................................... 16

    IV.  New York law does not apply to class members in other states. ................... 19

       A.  Absent any choice-of-law clause, Georgia law would apply to
           Plaintiff Papadopoulos's claim. ............................................................... 20

       B.  The application of New York law (as incorrectly described by
           Defendant) would conflict with a fundamental policy of Georgia law. ....... 21

    V.  Plaintiffs have "class standing." ................................................................ 25

Conclusion .................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*AES Corp. v. Dow Chem. Co.*, 325 F.3d 174 (3d Cir. 2003) ........................................... 9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................... 4

*Atkin v. Hill, Darlington & Grimm*, 224 N.Y.S.2d 553 (1962),
    *aff'd*, 12 N.Y.2d 940 (1963) .............................................................................. 17, 19

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
    2 F. Supp. 3d 550 (S.D.N.Y. 2014), *aff'd in part*, 813 F.3d 98 (2d Cir. 2016) .......... 9

*Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637 (S.D.N.Y. 2015) ........................... 10

*Beach v. Smith*, 30 N.Y. 116 (1864) ........................................................................ 17

*Beatie and Osborn LLP v. Patriot Scientific Corp.*,
    431 F. Supp. 2d 367 (S.D.N.Y. 2006) ................................................................. 20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................... 4

*Berkson v. Gogo LLC*, 97 F. Supp. 3d 359 (E.D.N.Y. 2015) ..................................... 15

*Boehnen v. Walston & Co.*, 358 F. Supp. 537 (D.S.D. 1973) ..................................... 24

*Brenner v. Oppenheimer & Co.*, 273 Kan. 525 (2002) ............................................... 24

*CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268 (1987) .......................................... 17

*DarkPulse, Inc. v. Crown Bridge Partners, LLC*, No. 22 CIV. 8163 (VM),
    2023 WL 6386006, at *1 (S.D.N.Y. Sept. 29, 2023) (Marrero, J.) ....................... 5, 6

*DeBlasio v. Merrill Lynch & Co.*, No. 07CIV318RJS,
    2009 WL 2242605, at *1 (S.D.N.Y. July 27, 2009) .......................................... 10, 11

*Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506 (S.D.N.Y. 1997) ...................... 17

*Dunn v. Global Trust Management, LLC*,
    506 F.Supp.3d 1214 (M.D. Fla. 2020) ................................................................. 22

*FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842 (Del. Ch.),
    *aff'd*, 148 A.3d 1171 (Del. 2016) ........................................................................ 24

*Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325 (2d Cir. 2005) ... 19, 20

*Getter v. R.G. Dickinson & Co.*, 366 F. Supp. 559 (S.D. Iowa 1973) ......................... 24

*Hatteras Enterprises Inc. v. Forsythe Cosm. Grp., Ltd.*, No.
    215CV05887ADSARL, 2018 WL 1935984, at *1 (E.D.N.Y. Apr. 23, 2018) .......... 20

*Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362 (E.D.N.Y. 2009),
    *aff'd*, 380 F. App'x 22 (2d Cir. 2010) ................................................................. 15

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) ................................................................. 25

*Lowe v. SEC*, 472 U.S. 181 (1985) ........................................................................ 12, 13

*Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 226 (1993) ................................ 21

*Medicrea USA, Inc. v. K2M Spine, Inc.*, No. 17 CIV. 8677 (AT),
    2018 WL 3407702, at *1 (S.D.N.Y. Feb. 7, 2018) ............................................... 22, 23

*Nanopierce Techs., Inc. v. Southridge Cap. Mgmt. LLC*,
    No. 02 CIV. 0767 (LBS), 2003 WL 22052894, at *1 (S.D.N.Y. Sept. 2, 2003) ........ 24

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012) ..................................................................................... 25

*NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, No. 22-1912,
    2023 WL 5761358, at *1 (2d Cir. Sept. 7, 2023) ................................................. 10, 11

*Nutracea v. Langley Park Invs. PLC*, No. 206CV-2019-MCE-DAD,
    2007 WL 135699, at *1 (E.D. Cal. Jan. 16, 2007) ..................................................... 24

*Omega Overseas Partners, Ltd. v. Griffith*, No. 13-CV-4202 RJS,
    2014 WL 3907082, at *1 (S.D.N.Y. Aug. 7, 2014) ...................................................... 8

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) ................................... 15

*S.E.C. v. Park*, 99 F. Supp. 2d 889 (N.D. Ill. 2000) ............................................. 13, 14

*Sajor v. Ampol*, 249 A.D. 852 (App. Div. 1937) ............................................................ 19

*Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012) .......................................... 20

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963) ............................... 9

*State ex rel. Geil v. Corcoran*, 623 S.W.2d 557 (Mo. App. 1981) ................................ 24

*Townsley v. Airxcel, Inc.*, 2018 WL 3946449, at *1 (S.D.N.Y. Aug. 15, 2018) ........... 24

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11 (1979) ............... 18

*United States v. Moseley*, 980 F.3d 9 (2d Cir. 2020) .................................................... 24

*Waithaka v. Amazon.com, Inc.*, 966 F.3d 10 (1st Cir. 2020) ....................................... 22

*Welch v. TD Ameritrade Holding Corp.*, No. 07 CIV. 6904 (RJS),
    2009 WL 2356131 at *1 (S.D.N.Y. July 27, 2009) ..................................................... 10

**Statutes**

§ 80b-2 ............................................................................................................................ 12

15 U.S.C. § 80b-15 ..................................................................................................... 8, 16

15 U.S.C. § 80b-2 ..................................................................................................... 11, 12

15 U.S.C. § 80b-6 ................................................................................... 11, 12, 13, 18

N.Y. Gen. Bus. Law § 352–c ........................................................................................ 18

N.Y. Gen. Bus. Law 359–eee .................................................................. 12, 17, 18, 19

O.C.G.A. § 10-5-51 ................................................................................. 12

O.C.G.A. § 10-5-58 ....................................................................... 8, 16, 23

**Other Authorities**

Restatement (Second) of Conflict of Laws § 187.............................. 20, 22, 23

**Rules**

Fed. R. Civ. P. 23(a)(3)......................................................................... 25

**Treatises**

12 Joseph C. Long, *Blue Sky Law* § 4:52 ................................................ 24

12 Joseph C. Long, *Blue Sky Law* § 4:55 ................................................ 21

**Administrative Proceedings**

*In re Weiss Research, Inc.*, Inv. Adv. Act Rel. No. 2525 (June 22, 2006).................. 14

# INTRODUCTION

Universally across the United States, companies and individuals who provide investment advice to the public in exchange for fees are required to register with the proper authorities—either the federal government or with various state governments. These laws exist specifically to protect the investing public—like Plaintiffs—from unscrupulous behavior and to assure investors that the advice they receive comes from those who are qualified to give it.

Despite this requirement, Defendant Seeking Alpha has for years sold individualized investment advice to retail investors, tailored to their specific portfolios and timed to market events, without having registered. As a result of Seeking Alpha's illegal investment advice, class members have suffered significant losses. But Plaintiffs do not seek to recover investment losses; instead, they merely seek to recover the fees that they paid to Seeking Alpha under these unlawful contracts. Seeking Alpha's attempts to escape its clear liability are unavailing.

On the merits, Seeking Alpha does not dispute that it meets the predicate definition of an investment adviser. Instead, Seeking Alpha claims that it is exempt from registration because it falls under the exception for bona fide publishers of newspapers. But as alleged in the Complaint, Seeking Alpha provides investment advice specifically attuned to individual subscribers' portfolios, and it does so on an irregular basis in response to changing market conditions. Courts and the SEC have made clear that such conduct does not qualify for the publishers exemption. Because of this, Seeking Alpha's agreements with its subscribers are void as a

matter of law and subject to rescission.

Trying to avoid the consequences of its unlawful failure to register, Seeking Alpha asks the Court to look beyond the complaint and simply accept Seeking Alpha's Terms of Use as a silver bullet to avoid its legal responsibilities as an investment advisor. Seeking Alpha's motion to dismiss is a premature and improper attempt to seek summary judgment and should be denied for that reason alone. But, even as to the merits, those arguments fail because (1) the Complaint never alleges that the Terms of Use constitute the contract between the parties, (2) the Terms of Use are unenforceable browsewrap, and (3) contractual terms purporting to waive compliance with the securities laws violate public policy. At a minimum, the enforceability of the Terms of Use involves factual questions that cannot be resolved on a motion to dismiss.

Seeking Alpha makes a handful of other arguments, most of which are predicated on the unenforceable Terms of Use, on a misreading of New York law, or that are disguised arguments under Rule 23 that are best addressed at the class certification stage of this case. None of those arguments has any merit, and accordingly, the Court should deny Seeking Alpha's motion and this case should proceed to discovery.

## BACKGROUND

Plaintiffs Sandy Papadopoulos and Matthew Lingley are residents of Georgia and New York, respectively, who are paid subscribers of Defendant Seeking Alpha's "Seeking Alpha Premium" service. Compl. ¶¶ 16–17. Seeking Alpha is an Israeli

corporation that is registered as a foreign corporation to do business in New York. *Id.* ¶ 15.

Seeking Alpha advertises "premium services" to potential customers as a way for them to make more money in the stock market. *Id.* ¶ 21. For example, Seeking Alpha advertises that its proprietary "Quant Rating System," which assigns particular stocks a "buy," "hold," or "sell" rating, outperforms traditional stock indices "by more than 4-to-1." *Id.* ¶¶ 22, 25–26. Seeking Alpha's ratings and classifications of these stocks are reviewed each day and changed whenever market conditions, stock characteristics, or other factors dictate. *Id.* ¶ 31.

But subscribers do not simply get access to a stock rating system—Seeking Alpha also provides access to a wealth of other personalized investment advice. For example, Seeking Alpha invites and enables premium-service subscribers to link their brokerage accounts to Seeking Alpha's platform, either electronically or by manually inputting their portfolios. *Id.* ¶¶ 34–35. Seeking Alpha then tracks their customers' portfolios and sends them *individualized* emails each day alerting them to Seeking Alpha's rating changes and providing recommendations for their investments. *Id.* ¶ 36. Seeking Alpha will warn its subscribers when it believes that stocks within their portfolios are "at high risk of performing badly." *Id.* ¶ 37.

Seeking Alpha also provides a feature called "screeners," which automatically reviews stocks as potential investments based on criteria selected by Seeking Alpha or by the customer. *Id.* ¶ 38. Seeking Alpha provides a number of pre-defined "screeners" that subscribers can use based on their individual "investment style or

– 3 –

preferences," but customers can also create custom, personalized screeners based on certain criteria that are important to them. *Id.* ¶¶ 40–41. Seeking Alpha updates these screeners, whether pre-defined or custom, in response to changing market conditions and circumstances, such as changes in reported earnings or dividends for a company. *Id.* ¶ 42.

And like the screeners, Seeking Alpha also provides certain tools that allow customers to compare potential investment opportunities, showing a side-by-side comparison of essential stock information. *Id.* ¶ 43. These comparisons can either be pre-defined using criteria that fit customers' "investment style or preferences," or customers can create their own custom comparisons. *Id.* ¶¶ 44–45.

Despite these highly personalized services and its provision of tailored investment advice, Seeking Alpha has failed to register as an investment advisor as required by state laws across the country. That failure to register requires Defendant to, at a minimum, disgorge all fees it has collected from class members. Accordingly, Plaintiffs seek rescission and restitution on behalf of themselves and those similarly situated.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Id.* In resolving a Rule 12(b)(6) motion, the Court must "confine its consideration to facts stated on the face of the complaint," and must "construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *DarkPulse, Inc. v. Crown Bridge Partners, LLC*, No. 22 CIV. 8163 (VM), 2023 WL 6386006, at *3 (S.D.N.Y. Sept. 29, 2023) (Marrero, J.) (quotations omitted).

## ARGUMENT

### I. Seeking Alpha provides investment advice without registering and any agreement, including the Terms of Use, are therefore void.

To prevail, Seeking Alpha's motion requires the Court to simultaneously rule on numerous disputed issues of fact, as well as complex choice-of-law and other fact-dependent legal questions. But the Court need not—indeed, cannot—reach these questions at this stage. The analysis here is simple. *First*, anyone who provides investment advice must register with the applicable authorities. *Second*, providing investment advice without registering is unlawful. *Third*, any agreement that is unlawful is void as a matter of law—which includes the Terms of Use Seeking Alpha leans so heavily upon. Accepting the allegations as true (as the Court must at this stage), the inquiry should end here, and the Court should deny the motion.

#### A. Seeking Alpha's "Motion to Dismiss" turns on disputed issues of fact and information beyond the face of the Complaint.

As an initial matter, Seeking Alpha relies on numerous facts and allegations outside the Complaint. This, of course, is inappropriate at the motion to dismiss stage, where the Court must "confine its consideration to facts stated on the face of

the complaint." *DarkPulse*, 2023 WL 6386006 at *3. The same is true of Seeking Alpha's factual disagreements and attempted re-characterizations of the services it contends it provided relevant to the bona fide publisher analysis. *See* ECF 30 at 12-17.

Here, the Complaint alleges that "Defendant provides personalized investment advice to subscribers of its Premium Services in exchange for compensation," which is sufficient to constitute a contract for services under New York law. Compl. ¶ 20. At no point in the Complaint do Plaintiffs allege that the Terms of Use actually *is* the contract between the parties,[1] let alone whether the specific Terms of Use cited by Plaintiffs are the correct Terms of Use. Indeed, as discussed further below, Plaintiffs deny that the Terms of Use are enforceable or represent the parties' agreement. *See* §§ II, IV.B *infra*. At this stage of the proceedings, the Court must accept the facts alleged in the Complaint—and *only* the facts alleged in the Complaint—as true. *See, e.g.*, *DarkPulse*, 2023 WL 6386006 at *3. Accordingly, the Court should deny Seeking Alpha's motion to the extent it relies upon disputed facts and materials beyond the face of the complaint.

## B. Seeking Alpha contracted to provide investment advice to its subscribers in exchange for fees.

The Complaint clearly alleges the existence of a contract to provide investment advice between Seeking Alpha and its subscribers. The nature of that

---

[1] While the Complaint references the Terms of Use, it merely alleges that "Defendant's website contains 'terms of use' that *purport to function* as a contract between Defendant and the users of the website and its Premium Services." Compl. ¶ 15.

contract is simple: Seeking Alpha offered to provide personalized investment advice in exchange for Plaintiffs' subscription fees (*i.e.*, compensation). Dkt. 1 ("Compl.") ¶¶ 20–26 (alleging that Defendant advertised and provided personalized investment advice in exchange for compensation), 29–45 (alleging specific facts that demonstrate the sale of personalized investment advice that Plaintiffs purchased from Defendant). This is sufficient to allege the existence of a contract.

Seeking Alpha does not seriously challenge the idea that Plaintiffs and Seeking Alpha entered into a contract. Instead, Seeking Alpha argues this was not an "investment adviser" contract because the website's Terms of Use (1) "does not require Seeking Alpha to provide investment advisory services," and (2) contains certain language buried in the fine print which purports to "disclaim" an investment-adviser relationship. MTD at 9–11.

But Seeking Alpha's arguments suffer from a foundational flaw: the Terms of Use do not constitute the contract between the parties alleged in the Complaint. The Complaint never alleges that the Terms of Use are the contract and, in any event, they are unenforceable browsewrap as described in more detail below. Thus, the Terms of Use are irrelevant to the analysis. But even if the Terms of Use did constitute terms of the contract between Plaintiffs and Seeking Alpha, Seeking Alpha's arguments would still fail.

*First*, Seeking Alpha's definition of an "investment advisor" contract is far too narrow. Under Seeking Alpha's definition, a contract must *expressly* state that it is a contract for the provision of investment adviser services. But the law is not so

formalized; parties cannot escape their legal obligations simply by omitting certain specific language. *See Omega Overseas Partners, Ltd. v. Griffith*, No. 13-CV-4202 RJS, 2014 WL 3907082, at *4 n.5 (S.D.N.Y. Aug. 7, 2014) ("the circumstances surrounding a contract's performance can make the performance required illegal even if the contract's terms are themselves innocuous."). Rather, the relevant analysis is qualitative: was the provision of investment advice a central or marginal feature of the relationship?

*Second*, Seeking Alpha cannot simply disclaim away its legal obligations—indeed, the law expressly states that such attempts are *void*. Congress and state legislatures foresaw that investment advisers would, if left unchecked, attempt to disclaim their legal obligations in boilerplate contracts, and they expressly provided that all such provisions are void.[2] *See*, *e.g.*, 15 U.S.C. § 80b-15(a); O.C.G.A. § 10-5-58(l) ("A condition, stipulation, or provision binding a person … receiving investment advice to waive compliance with this chapter … is void.").[3] Indeed, courts have routinely held that boilerplate disclaimer clauses like the ones included in the Terms of Use are void under identical provisions of the other federal

---

[2] With the exception of its argument that New York's Martin Act does not provide a private right of action, Seeking Alpha concedes that the state securities laws are interpreted in accordance with the IAA. *See* MTD at 8.

[3] Contrary to Seeking Alpha's argument, these anti-waiver provisions are not limited to claims alleging fraud. The anti-waiver statutes very clearly state that provisions attempting to waive compliance with the entirety of the scheme—which includes the registration requirement—are void. *E.g.*, 15 U.S.C. § 80b-15(a) ("this *subchapter*") (emphasis added); O.C.G.A. § 10-5-58(l) ("this *chapter*") (emphasis added).

securities acts. *See, e.g.*, *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 562 (S.D.N.Y. 2014) (express warning "not to rely on" document held unenforceable because it would operate as a waiver of obligations under the Exchange Act), *aff'd in part*, 813 F.3d 98 (2d Cir. 2016); *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 180 (3d Cir. 2003) (noting that there is no difference between "waiver" language and language that would have the same effect). The first step in those courts' analyses was to determine whether the challenged conduct violated the securities laws. That same analytical approach applies under the IAA and state investment-adviser registration laws. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963) ("Congress intended the [IAA] to be construed like other securities legislation[.]")

Here, the entire purpose of the contractual relationship between the Defendant and the class members is the purchase of personalized investment advice, and the alleged illegality (*i.e.*, failure of Defendant to register) infects the very formation of that contract. Absent registration, the contract cannot, under any circumstance, be performed legally. Whether the contract is an investment-adviser contract is therefore wholly dependent on whether or not Seeking Alpha provides personalized investment advice. Because Seeking Alpha is providing personalized investment advice (and thus not exempt), the contract is clearly illegal, and any disclaimers, choice-of-law provisions, and other clauses in the Terms of Use are otherwise null and void. To decide that there is no investment-adviser contract before deciding whether Seeking Alpha is an investment adviser would be

inappropriately putting the cart before the horse.

In contrast, the cases Seeking Alpha cites involved starkly different allegations than those here. In those cases, the parties' relationship was not centered around investment advice, and the allegedly illegal conduct was largely beyond the scope of their agreement.[4] *See, e.g.*, *DeBlasio v. Merrill Lynch & Co.*, No. 07CIV318RJS, 2009 WL 2242605, at *1 (S.D.N.Y. July 27, 2009) (plaintiffs had brokerage accounts with defendant banks, who offered a side cash-sweep program; plaintiffs alleged that defendants failed to disclose their financial interest in the cash-sweep program); *Welch v. TD Ameritrade Holding Corp.*, No. 07 CIV. 6904 (RJS), 2009 WL 2356131 at *5 (S.D.N.Y. July 27, 2009) (similar); *NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, No. 22-1912, 2023 WL 5761358, at *3 (2d Cir. Sept. 7, 2023) (arguing that "the alleged misconduct occurred in the course of the Advisers' performance of their *general portfolio-management activities*.") (emphasis added). In other words, the central purpose of the parties' relationship in those cases was not investment advice. The express terms of a contract may help clarify the nature of an otherwise ambiguous relationship, but that is far different than what is alleged here. There is no ambiguity about the services Seeking Alpha promised to provide in exchange for a fee.

And to the extent those cases addressed any disclaimer language, they certainly do not stand for the idea that any contract that disclaims creating an

---

[4] Notably, the *Bank Leumi USA v. Ehrlich* case Seeking Alpha cites was decided on a motion for summary judgment, *not* a motion to dismiss. MTD at 11 (citing 98 F. Supp. 3d 637 (S.D.N.Y. 2015)).

investment-adviser relationship is, as a matter of law, not a contract for the sale of investment advice regardless of the substance of the transaction. In each of those cases, the plaintiffs were either attempting to transform a broker-dealer relationship into an investment-adviser relationship or to assert a private right of action for fraud under the IAA, which the Supreme Court has expressly rejected. *See, e.g.*, *DeBlasio*, 2009 WL 2242605, at *1 (plaintiffs had brokerage accounts with defendant banks, who offered a side cash-sweep program); *NexPoint*, 2023 WL 5761358, at *3 (rejecting private right of action when defendants were alleged to have committed fraud in violation of § 206 of the IAA).

In short, Seeking Alpha cannot market itself as providing personalized investment advice in exchange for compensation, unlawfully provide that advice for compensation, and then claim it is not required to register because of boilerplate disclaimers in its terms of use. Seeking Alpha's argument to the contrary puts form over substance and is not reflective of the law.

**C. Seeking Alpha is not a bona fide publisher.**

As set forth in the Complaint, Seeking Alpha provides investment advice, as defined by the various federal and state IAAs. The IAA defines an "investment adviser" as

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C. § 80b-2. State definitions are, for the most part, identical. *See*, *e.g.*, N.Y.

– 11 –

Gen. Bus. Law 359–eee(1)(a) (similar); O.C.G.A. § 10-5-51 (similar). Seeking Alpha does not dispute that its business clearly falls within this primary statutory definition. Rather, Seeking Alpha argues that its business falls under the "bona fide publisher" exception to this definition, which exempts any "bona fide newspaper, news magazine or business or financial publication of general and regular circulation." *Id.* § 80b-2(11)(D).[5] To fall under this exemption, the Supreme Court has said that a defendant publication must be both "bona fide" and be of "regular and general circulation." *Lowe v. SEC*, 472 U.S. 181, 206 (1985). Putting aside whether Seeking Alpha's services even count as a "publication," its premium services are certainly not in "general and regular circulation," and thus are not protected under the exemption. *See, e.g.*, Compl. ¶¶ 36–37, 42.

To qualify as being in "general and regular circulation," the Supreme Court made clear that the advice must be "offered to the general public on a regular schedule." *Id.* Seeking Alpha concedes that publications that are "issued from time to time in response to episodic market activities" do not fall under the publishers

---

[5] Contrary to Seeking Alpha's brief, New York's definition of the publisher's exemption is not "broader" than the federal definition. *See* MTD at 17 n.11. If anything, it is actually narrower. Whereas the federal definition exempts "publisher[s] of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation," New York's definition only exempts "publisher[s] of any bona fide newspaper or news magazine." *Compare* 15 U.S.C. § 80b-2(11) *with* N.Y. Gen. Bus. Law § 359–eee. Seeking Alpha focuses on New York's omission of "general and regular circulation," but completely fails to mention the far more important omission of "business or financial publication," the only provision under which Seeking Alpha would even qualify. Because Seeking Alpha is neither a newspaper nor a news magazine, Seeking Alpha clearly does not fall under New York's publisher's exemption to the extent it even applies in this case.

– 12 –

exemption. MTD at 16 (quoting *Lowe*, 427 U.S. at 206). The complaint expressly alleges, multiple times, that Seeking Alpha's offerings and advice are not offered on any regular schedule. *See*, *e.g.*, Compl. ¶¶ 22 (advertising "strong buy" and "strong sell" alerts for "your stocks" and "critical market updates-day and night"), 31 (alleging recommendations change whenever market characteristics dictate), 34 (recommending an app to "stay connected to news and analysis that directly affect your portfolio"), 37 (advertising "on-site warnings" for stocks in portfolio), 41 (advertising customized screeners that can be created at any time), 45 (advertising customized comparisons that can be created at any time). These specific factual allegations demonstrate that Seeking Alpha's communications are not of "regular and general circulation." *Lowe*, 472 U.S. at 206; *see also S.E.C. v. Park*, 99 F. Supp. 2d 889, 896 (N.D. Ill. 2000) ("Although Defendants may have made postings on a daily basis, it is unclear whether Defendants did not time their advice to 'specific market activity, or to events affecting or having the ability to affect the securities industry.'") (quoting *Lowe*, 472 U.S. at 209).

Moreover, publications that "offer individualized advice attuned to any specific portfolio"—as Seeking Alpha's communications with its subscribers clearly do—likewise do not fall under the publishers exemption. *Lowe*, 472 U.S. at 206. As alleged in the Complaint, different investors will each receive totally different sets of email alerts, breaking news alerts, and on-site warnings based on their individual portfolios linked to Seeking Alpha's website. Compl. ¶¶ 33–37. If those facts do not render the investment advice "attuned to any specific portfolio," it is

– 13 –

difficult to imagine what would. This case is even stronger than the ones in which courts and the SEC have concluded that the publishers exemption does not apply. *See Park*, 99 F. Supp. 2d at 895-96; *In re Weiss Research, Inc.*, Inv. Adv. Act Rel. No. 2525 (June 22, 2006) (concluding that a nearly identical business made respondents "investment advisers").

If a company had human employees doing exactly what Seeking Alpha does (tracking clients' individual stock portfolios and calling or writing them with recommendations to buy or sell based on the company's analysis of market events), there would be no question that it was an investment adviser relationship subject to the IAA and comparable state laws. Indeed, that would be nothing more than a standard, non-discretionary investment-adviser relationship of the kind offered by many large institutional investment advisers. The mere fact that Seeking Alpha does the same thing electronically, behind the mask of a computer rather than through phone calls or letters, does not exempt Seeking Alpha from the statutory protections that legislatures have provided for consumers and investors.

Accordingly, Plaintiffs have pled facts demonstrating that Seeking Alpha does not fall under the exemption.

## II. In addition to being void as part of an unlawful agreement, the Terms of Use are unenforceable browsewrap.

Even if the Complaint contained enough allegations to suggest that the Terms of Use potentially applied in this context, the Terms of Use are

unenforceable browsewrap.[6] The rise of the internet "has not fundamentally altered the principles of contract." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004). "It is a basic tenet of contract law that in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 366 (E.D.N.Y. 2009), *aff'd*, 380 F. App'x 22 (2d Cir. 2010) (quotations omitted). "Where the terms of the contract are offered by one party to another, unequivocal acceptance of the terms by the receiving party is required." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 388 (E.D.N.Y. 2015).

When it comes to the internet, there are four general types of consumer contracts: "(a) browsewrap; (b) clickwrap; (c) scrollwrap; and (d) sign-in-wrap." *Id.* at 394–95. Browsewrap—the only form of agreement relevant to this motion—"exists where the online host dictates that assent is given merely by using the site." *Id.* "[C]ourts generally have enforced browsewrap terms only against knowledgeable accessors, such as corporations, *not against individuals*." *Id.* at 396 (emphasis added; collecting cases).

Here, Seeking Alpha's website includes the Terms of Use at the very bottom of the webpage in small, un-bolded font below a series of numerous links. *See Berkson*, 97 F. Supp. 3d at 396 ("'terms of use' will not be enforced where the link to a website's terms is buried at the bottom of a webpage or tucked away in obscure

---

[6] Plaintiffs maintain that this argument is ultimately irrelevant because the Complaint nowhere alleges that the Terms of Use actually *is* the contract between Plaintiffs and Seeking Alpha. But to the extent the Court reaches this argument and finds that it requires additional facts not pleaded in the Complaint, Plaintiffs respectfully request the opportunity to amend their Complaint to include them.

– 15 –

corners of the website where users are unlikely to see it.") (collecting cases). Nowhere does the website call attention to the Terms of Use or require explicit assent to its terms in order to continue using the website. This is quintessential browsewrap that lacks the notice and assent required to create a contract, particularly against individuals like Plaintiffs and class members. *Berkson*, 97 F. Supp. 3d at 396 (collecting cases). And even if the Court were ultimately to rule in favor of enforceability, it would have to resolve numerous factual issues against Plaintiffs in order to do so. That is inappropriate for resolution at this stage, where the Court must look only to those facts that are alleged in the complaint, take them as true, and draw all reasonable inferences in Plaintiffs' favor.

## III.  Rescission is an available and appropriate remedy under New York law to the extent it applies in this case.

Seeking Alpha acknowledges that the vast majority of other states—including Georgia—provide for the right to rescind any contract with an unregistered investment advisor and get their money back. *See, e.g.*, ECF 31 at 14 (recognizing remedy to void an agreement under IAA; 15 U.S.C. § 80b-15(a); O.C.G.A. § 10-5-58(e). But Seeking Alpha hangs its hat on New York's Martin Act, which it claims applies to all the claims in this case and precludes any private right of action. Among the many issues in dispute, the parties disagree about what forum's laws should control the analysis. *See* § IV *infra* (discussing why New York law does not apply to non-New York class members). But no matter which state's laws apply to the claims at issue in this case—even New York's—Seeking Alpha's subscribers have a right to rescind contracts which are contrary to law and void.

Under New York law, "where one of the parties to an illegal contract is innocent of wrongdoing, courts have allowed such party to seek relief in the form of rescission based on the illegal conduct of the other party to the agreement." *Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506, 533 (S.D.N.Y. 1997) (collecting cases). This is particularly true where a statute is clearly designed to protect the public and the violation of the statute taints the very transaction at issue. In such cases, New York courts have found that "the allowance of rescission in a proper case is in our opinion essential to carry out the Legislature's intent." *Atkin v. Hill, Darlington & Grimm*, 224 N.Y.S.2d 553, 557 (1962), *aff'd*, 12 N.Y.2d 940 (1963).

Here, the Martin Act makes clear that it is "unlawful for any investment adviser … to engage as such within or from the state of New York unless and until such person shall have filed [a registration statement] with the department of law[.]" N.Y. Gen. Bus. Law § 359–eee(2)(a). It is well established that a "contract is illegal and void [where] it is against the express prohibition of [a] statute." *Beach v. Smith*, 30 N.Y. 116, 118 (1864).

Seeking Alpha points to certain cases which have cursorily said in passing that the Martin Act *in toto* does not provide a private right of action. MTD at 19–20. But none of those cases involved attempted recission of an illegal contract for the provision of investment advice. The broad language these cases use ultimately traces back to *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268 (1987). There, the plaintiffs tried to sue for fraudulent misrepresentations in the sale of certain

securities.[7] In addressing whether the Martin Act's § 352–c provided a private right of action, the New York Court of Appeals examined the specific purpose of that section and held that it did not:

> The majority of this court holds that an implied private action is not consistent with the legislative scheme underlying the Martin Act and, ***specifically, section 352-c*** …
>
> Inasmuch as the court does now decide that ***the particular purpose of section 352–c*** is the creation of an enforcement mechanism within which a private action is not implied, further elaboration of our respective positions on the application of settled rules to this specific statute is unnecessary."

*Id.* at 276–77 (emphasis added). But as the emphasized language shows, the Court of Appeals' reasoning was restricted specifically to § 352–c. Nothing about its reasoning extended to other provisions of the Martin Act, nor did it suggest that private plaintiffs lacked common law remedies for rescission of illegal contracts.

Notably, this analysis is fully compatible with the Supreme Court's decision in *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, where the Supreme Court found that IAA § 206—the IAA's analogue to the Martin Act's § 352–c—did *not* imply a private right of action because, like the Martin Act, § 206 provides specific judicial and administrative means for enforcement. 444 U.S. 11, 19–20 (1979). But the Supreme Court noted that the IAA's registration requirement (like the Martin Act's § 359–eee, the provision at issue in this case) was very different. *Id.* 16–17.

---

[7] Notably, the plaintiffs in that case sued directly for damages under the Martin Act. They did not pursue the remedy of rescission.

Thus, the fact that *one* provision of a statutory scheme lacks a private right of action does not mean that *all* provisions of that scheme do. *See, e.g.*, *Atkin*, 224 N.Y.S.2d at 558 (finding rescission to be an appropriate remedy for the purchase of securities in an unregistered insurer despite the superintendent's otherwise broad enforcement powers); *Sajor v. Ampol*, 249 A.D. 852, 852 (App. Div. 1937) (unanimously affirming judgment in plaintiff's favor to rescind on contract for purchase of stock which violated one of the Martin Act's registration requirements). Accordingly, to the extent New York law applies, Plaintiffs have a right to rescind their contracts, which are illegal under § 359–eee.

## IV.  New York law does not apply to class members in other states.

Defendant argues that its relationship with *all* of its customers, wherever they live, is governed by New York law. It further claims that New York is alone among states in not recognizing a right to rescind an illegal contract with an unregistered investment adviser. The claim about New York law is incorrect, as set forth above, § III *supra*, but even if it were correct, it would not matter for Plaintiff Papadopoulos or any class member who lives outside of New York.

Defendant bases its argument on a choice-of-law clause in the Terms of Use. As noted elsewhere in this brief, the Terms of Use are not enforceable for multiple, independent reasons. §§ I.B, II *supra*. But even if they were generally enforceable, the choice-of-law clause itself would still be unenforceable for violating public policy.

The question of whether to enforce a choice-of-law clause is a threshold issue determined *before* applying the law contained with the choice-of-law clause itself. *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 332 (2d Cir. 2005);

*see also Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119, 126–27 (2d Cir. 2012)

("Applying the choice-of-law clause to resolve the contract formation issue would

presume the applicability of a provision before its adoption by the parties has been

established."). In determining whether to enforce a choice-of-law clause, "New York

courts follow the test laid out in the Restatement (Second) of Conflict of Laws

§ 187." *Hatteras Enterprises Inc. v. Forsythe Cosm. Grp., Ltd.*, No.

215CV05887ADSARL, 2018 WL 1935984, at *5 (E.D.N.Y. Apr. 23, 2018). Under

that test, New York courts will refuse to enforce a choice-of-law clause where

"application of the chosen law would violate a fundamental public policy of another

jurisdiction with materially greater interests in the dispute." *Beatie and Osborn*

*LLP v. Patriot Scientific Corp.*, 431 F. Supp. 2d 367, 378 (S.D.N.Y. 2006); *see also*

Restatement (Second) of Conflict of Laws § 187(2). Making this determination

involves two steps: "[1] the Court first must determine whether [another state's] law

would govern this dispute in the absence of the parties' contractual choice-of law

provisions; and [2] if so, the Court must decide whether the application of New York

law would violate a fundamental public policy of [that state]." *Beatie and Osborn*,

431 F. Supp. 2d at 378.

### A. Absent any choice-of-law clause, Georgia law would apply to Plaintiff Papadopoulos's claim.

When it comes to contract claims, "New York courts apply the 'center of

gravity' or 'grouping of contacts' choice of law theory." *Fin. One*, 414 F.3d at 336.

"Traditional choice of law factors"—such as the place where the contract was

signed—"should be given 'heavy weight' in a grouping of contacts analysis." *Matter*

*of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 226 (1993). But there are also "instances where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests, and therefore should be considered." *Id.* This occurs particularly in "heavily regulated" industries, which implicate "both the private economic interests of the parties and governmental interests in the enforcement of its regulatory scheme." *Id.* at 226–27. In such cases, courts are called to "properly consider State interests," even in contract cases. *Id.* (declining to apply New York law in an auto insurance case given the heavy regulation and strong governmental interests at play in the insurance context).

Given that the primary purpose of the blue-sky laws is to protect *investors*, the state of the investor's residence clearly has the primary interest—in this case, Georgia. Indeed, "some seven cases have considered the public policy issue in connection with the state securities acts. All have concluded that the public policy of the state where the investor was located" is of primary importance and, ultimately, "invalidates any choice of laws clause" to the contrary. 12 Joseph C. Long, *Blue Sky Law* § 4:55 (collecting cases). Absent any choice-of-law clause, therefore, Georgia law would apply to Plaintiff Papadopoulos's claim.[8]

### B. The application of New York law (as incorrectly described by Defendant) would conflict with a fundamental policy of Georgia law.

If Seeking Alpha were correct that New York law does not allow for Plaintiffs to rescind their contracts, then the application of New York law to Plaintiff

---

[8] The same analysis would apply for any non-New York absent class member.

Papadopoulos's claim would conflict with Georgia's fundamental policy of providing remedies to its resident investors for illegal activity by investment advisors. "Although not every statutory enactment represents a state's fundamental policy, 'a fundamental policy may be embodied in a statute which *makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power.*'" *Medicrea USA, Inc. v. K2M Spine, Inc.*, No. 17 CIV. 8677 (AT), 2018 WL 3407702, at *10 (S.D.N.Y. Feb. 7, 2018) (emphasis added) (quoting Restatement (Second) of Conflict of Laws § 187, cmt. G.).

The Restatement—which New York has adopted—gives insurance as a prime example that could just as easily apply to the facts of this case. Restatement (Second) of Conflict of Laws § 187, cmt. G., Illustration 10). And courts have consistently found similarly that fundamental state policies were at stake in other contexts involving statutes designed to protect consumers, employees, and others with unequal bargaining power. *See, e.g., Medicrea*, 2018 WL 3407702, at *9 (noncompete); *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 34 (1st Cir. 2020) (class-action waiver); *Dunn v. Global Trust Management, LLC*, 506 F.Supp.3d 1214, 1236 (M.D. Fla. 2020) (law protecting consumer borrowers).

Like those other areas of the law, blue-sky statutes of the sort at issue in this case are primarily intended to protect a class of people—investors—from unscrupulous and fraudulent conduct by businesses. So strong are its interests in protecting its investors that Georgia's blue-sky law explicitly "make[s] one or more kinds of contracts illegal" by declaring that contracts with unregistered investment

advisors are unlawful and providing investors the ability to get their money back. Restatement (Second) of Conflict of Laws § 187, cmt. G; O.C.G.A. § 10-5-58(1). Georgia further protects that interest by declaring "void" any attempt by private parties to contract around the registration requirement. *Id.* § 10-5-58(l) ("A condition, stipulation, or provision binding a person … receiving investment advice to waive compliance with this chapter … is void."). And in order to give investors the tools they need to enforce these interests, Georgia—along with the vast majority of other states in the Union—provides an express right of action for investors to rescind any contract with an unregistered investment advisor and get their money back. *Id.* § 10-5-58(e). Given this regulatory scheme, Georgia's blue-sky laws clearly qualify as a "fundamental policy." *Medicrea*, 2018 WL 3407702, at \*10.

      If Seeking Alpha is correct that its subscribers would not have a right of rescission under New York law,[9] then enforcing an adhesion contract's choice-of-law clause against non-New York investors would effectively deprive investors of virtually any remedy under state securities laws, no matter where they live. In other words, companies like Seeking Alpha could essentially skirt all state investor-protection laws and regulations by the simple expedient of including a choice-of-law clause somewhere in the fine print of their website. This result is not only inequitable but also "clearly should be against public policy." *Nanopierce Techs., Inc. v. Southridge Cap. Mgmt. LLC*, No. 02 CIV. 0767 (LBS), 2003 WL 22052894, at \*6

---

[9] As discussed in § III *supra*, Seeking Alpha is incorrect—New York law *does* allow a right of rescission in this case.

n.6 (S.D.N.Y. Sept. 2, 2003) (quoting 12 Joseph C. Long, *Blue Sky Law* § 4:52).[10]

Indeed, courts have repeatedly rejected such efforts to preclude investors from

exercising their rights of recovery under state securities statutes. *See, e.g.*, *Brenner*

*v. Oppenheimer & Co.*, 273 Kan. 525, 548–49 (2002) (rejecting New York choice-of-

law clause in case involving blue-sky statute); *Nutracea v. Langley Park Invs. PLC*,

No. 206CV-2019-MCE-DAD, 2007 WL 135699, at *2 (E.D. Cal. Jan. 16, 2007)

(same); *State ex rel. Geil v. Corcoran*, 623 S.W.2d 557, 559–60 (Mo. App. 1981)

(same); *Boehnen v. Walston & Co.*, 358 F. Supp. 537, 541 (D.S.D. 1973) (same);

*Getter v. R.G. Dickinson & Co.*, 366 F. Supp. 559 (S.D. Iowa 1973) (same).[11]

Therefore, if the Court were to find that New York law does not allow for

rescission, the Court should follow the example of the cases which have preceded it

and set aside the choice-of-law clause for class members in other states.

---

[10] Beyond the comity issues implicated by New York's conflict-of-law principles, such a result may also implicate Commerce Clause concerns by impermissibly expanding blue-sky reach well beyond state borders. *See FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842, 856 (Del. Ch.), *aff'd*, 148 A.3d 1171 (Del. 2016).

[11] The one case Seeking Alpha cites in its brief to support its argument is inapposite for a number of reasons. MTD at 18 (citing *Townsley v. Airxcel, Inc.*, 2018 WL 3946449, at *7 (S.D.N.Y. Aug. 15, 2018)). The *Townsley* court's quoted statement is not only *dicta*, but it also cites no authority and contains no analysis whatsoever. *Id.* Moreover, that case involved a corporate merger agreement between two sophisticated entities—not the type of individual investor whom the blue-sky laws are intended to protect. *See United States v. Moseley*, 980 F.3d 9, 21–22 (2d Cir. 2020) (distinguishing cases enforcing choice-of-law clauses in usury-defense cases because they involved "corporations—the antithesis of the type of needy and unsophisticated consumers" protected by the policy).

## V.   Plaintiffs have "class standing."

Last, Seeking Alpha's standing argument is a premature Rule 23(a)(3) typicality argument that is not ripe for consideration until the class-certification stage. There is no doubt that Plaintiffs have Article III standing to sue in their own right. Instead, Seeking Alpha appears to argue that Plaintiff's lack "class standing," *i.e.*, "standing to assert claims *on behalf of*" putative class members. That is an issue for class certification, not a motion to dismiss. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 459 (S.D.N.Y. 2018) (after a named plaintiff satisfies Article III, "the inquiry shift[s] to a class action analysis and the question of class standing[.]") (quotations omitted). Thus, the entire analysis is premature.

Nevertheless, Plaintiffs clearly have class standing here. The Second Circuit has made clear that a named plaintiff's claims need not be identical to putative class members to have class standing. *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) ("the district court's requirement that NECA 'show that its injuries are the *same* [as putative class members]' was error"). Accordingly, Plaintiffs plainly have standing in this case.

### CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court deny Seeking Alpha's motion to dismiss. If, however, the Court is inclined to grant the motion, Plaintiffs respectfully request the opportunity to amend their Complaint.

Respectfully submitted, this 31st day of October, 2023.

/s/ Joshua A. Mayes
Joshua A. Mayes*
Jason S. Alloy*
Matthew T. Parrish*
Edward A. Bedard*
ROBBINS ALLOY BELINFANTE
    LITTLEFIELD LLC
500 14th Street, NW
Atlanta, GA 30318
T: (404) 856-3266
F: (404) 856-3255
E: jmayes@robbinsfirm.com
    jalloy@robbinsfirm.com
    mparrish@robbinsfirm.com
    ebedard@robbinsfirm.com

Frederic J. Bold, Jr.*
BONDURANT MIXSON & ELLMORE, LLP
1201 W. Peachtree St., Ste. 3900
Atlanta, GA 30309
T: (404) 881-4100
F: (404) 881-4111
E  bold@bmelaw.com

J. Thomas Clarkson*
GRIFFIN DURHAM TANNER CLARKSON
75 14th Street NE, Suite 2130
Atlanta, GA 30309
E: tclarkson@griffindurham.com

*pro hac vice

Attorneys for Plaintiffs Matthew Lingley
and Sandy Papadopoulos