```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  8/15/24
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MATTHEW LINGLEY and SANDY PAPADOPOULOS,
on behalf of themselves and all others
similarly situated,

                    Plaintiffs,

          - against -

SEEKING ALPHA, INC.,

                    Defendant.

---

**23 Civ. 5849 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

     This litigation comprises a proposed class action in which plaintiffs Matthew Lingley and Sandy Papadopoulos ("Plaintiffs"), on behalf of themselves and others similarly situated, bring a claim for rescission and restitution of allegedly void investment advisory contracts they entered into with defendant Seeking Alpha, Inc. ("Seeking Alpha"). Now before the Court is Seeking Alpha's motion to dismiss the complaint (hereinafter the "Complaint" or "Compl.") (See Dkt. No. 29.) For the reasons stated below, the Court **GRANTS** the motion.

## I.    BACKGROUND[1]

     Seeking Alpha, an Israeli corporation with an office in New York City, operates a website whose content relates to

---

[1] Except as otherwise noted, the facts stated here are alleged in the Complaint. (See Dkt. No. 6.) For the purposes of addressing the instant

publicly traded equity securities. The website offers paying subscribers access to two premium services: Seeking Alpha Premium and Seeking Alpha Pro (together the "Premium Services"). There are more than 200,000 such subscribers.

Seeking Alpha holds out the Premium Services as a tool that investors can use to make money in the stock market. Subscribers receive, via Seeking Alpha's website and email alerts, exclusive access to certain information and recommendations relating to securities, including articles written by independent authors for Seeking Alpha and aggregated ratings of Wall Street analysts. Seeking Alpha's website claims that its proprietary "Quant Rating System" outperforms traditional stock indices "by more than 4-to-1." (Compl., Dkt. No. 6, ¶ 25.) Additionally, subscribers can view "Factor Grades" (id. ¶ 29) for thousands of individual securities, which rate stocks with respect to various metrics such as growth, profitability, and momentum. Each stock is also given an overall grade, such as "Strong Buy" or "Hold." (Id. ¶ 30.) Seeking Alpha's stock classifications are reviewed daily by its analysts and managers, and its

---

motion to dismiss, the Court assumes all facts alleged in the Complaint are true and draws all reasonable inferences in Plaintiffs' favor. See Lateral Recovery, LLC v. Cap. Merch. Servs., LLC, 632 F. Supp. 3d 402, 435 (S.D.N.Y. 2022).

recommendations are changed based on market conditions and other factors.

Subscribers can link their brokerage accounts and individual portfolios to the Premium Services so that Seeking Alpha can alert them to ratings changes and recommendations for their investments. Subscribers can also receive that material by manually entering information about their portfolios. Seeking Alpha provides "on-site warnings" to subscribers, which alert them that stocks in their portfolios are "at high risk of performing badly." (Compl. ¶ 37.) The website also offers a "stock screener" (id. ¶ 39) that identifies stocks to subscribers for potential investment based on criteria they select or on pre-defined criteria such as "Top Rated Dividend Stocks" or "Top Growth Stocks" (id. ¶ 40). These screeners are updated in response to market conditions or changed circumstances, such as a company's newly reported earnings or dividends. A similar feature allows subscribers to compare potential investment opportunities based on their investment styles or preferences.

Plaintiffs are residents of New York and Georgia, respectively, and are paid subscribers to Seeking Alpha Premium. In July 2023, they filed this proposed class action, alleging that Seeking Alpha is an investment adviser as

defined by the Investment Advisers Act of 1940 (the "IAA"),
<u>see</u> 15 U.S.C. § 80b-1 et seq., and the laws of all fifty
states and the District of Columbia and that Seeking Alpha
has not registered as such. They bring a claim for rescission
and restitution, alleging that contracts designed to provide
investment advisory services by unregistered investment
advisers are void. Plaintiffs seek restitution of all
compensation they and purported class members paid under
those allegedly void contracts. Following an exchange of pre-
motion letters pursuant to the Court's Individual Practices,
Seeking Alpha now moves to dismiss the Complaint under Federal
Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").

## II.  <u>LEGAL STANDARD</u>

To survive a Rule 12(b)(6) motion, "a complaint must
contain sufficient factual matter, accepted as true, to
'state a claim to relief that is plausible on its
face.'" <u>Ashcroft   v.   Iqbal</u>,   556   U.S.   662,   678
(2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570
(2007)). This standard is satisfied "when the plaintiff
pleads factual content that allows the court to draw the
reasonable inference that the defendant is liable for the
misconduct alleged." <u>Id.</u> Put differently, a complaint should
not be dismissed when the plaintiff's allegations

4

sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678.

A Rule 12(b)(6) motion challenges only the legal feasibility of the complaint, and courts adjudicating such motions "take[] no account of the complaint's 'basis in evidence.'" Nunes v. NBCUniversal Media, LLC, 643 F. Supp. 3d 403, 411 (S.D.N.Y. 2022) (quoting Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016)). The Rule 12(b)(6) standard instructs the Court to construe the complaint "liberally." In re Inclusive Access Course Materials Antitrust Litig., 544 F. Supp. 3d 420, 431 (S.D.N.Y. 2021) (quoting Coal. for Competitive Elec. v. Zibelman, 906 F.3d 41, 48-49 (2d Cir. 2018)). But a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." Twombly, 550 U.S. at 545. And in addition to "facts stated on the face of the complaint," courts adjudicating Rule 12(b)(6) motions can appropriately consider "documents incorporated in the complaint, matters of which judicial notice may be taken and documents that are 'integral' to the complaint." Nunes, 643 F. Supp. 3d at 411 (quoting Goel, 820 F.3d at 559).

### III. <u>DISCUSSION</u>

Plaintiffs seek relief on the grounds that Seeking Alpha operates as an unregistered investment adviser and that alleged investment advisory contracts between themselves and Seeking Alpha are thus void. In their pre-motion letter to Seeking Alpha, Plaintiffs made clear that they bring their claim for rescission and restitution "exclusively under state law." (Dkt. No. 23-1 at 1.) But apart from a dispute not pertinent to the Court's disposition of the instant motion, the parties agree that, as relevant here, state law is to be interpreted in accordance with the IAA. (<u>See</u> Compl. ¶ 74 (citing <u>Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis</u>, 444 U.S. 11, 19 (1979) (holding that implied private right of action exists under IAA to rescind void investment advisory contract)); Dkt. No. 30 at 8; Dkt. No. 32 [hereinafter "Opp'n"] at 8 n.2.) The legal feasibility of Plaintiffs' claim for rescission and restitution therefore depends on whether, under state law as interpreted in harmony with the IAA, Seeking Alpha's conduct described in the Complaint would qualify Seeking Alpha as an investment adviser. <u>See DeBlasio v. Merrill Lynch & Co.</u>, No. 07 Civ. 318, 2009 WL 2242605, at *16 (S.D.N.Y. July 27, 2009) (stating that to maintain a private action under the IAA, "a plaintiff must allege that he or she entered into a contract for investment advisory

services *with an investment adviser*" (emphasis added)).
Plaintiffs agree with this framing. (See Opp'n at 9–10
(arguing that first step in the Court's analysis should be to
determine "whether Seeking Alpha is an investment adviser").)

> The IAA defines an investment adviser as
>
> any person who, for compensation, engages in the
> business of advising others, either directly or through
> publications or writings, as to the value of securities
> or as to the advisability of investing in, purchasing,
> or selling securities, or who, for compensation and as
> part of a regular business, issues or promulgates
> analyses or reports concerning securities.

15 U.S.C. § 80b-2(a)(11). But the definition expressly
excepts from its reach "the publisher of any bona fide
newspaper, news magazine or business or financial publication
of general and regular circulation." Id. Further, Plaintiffs
do not dispute that it was their burden at the pleading stage
to allege facts sufficient to plausibly establish that
Seeking Alpha is not protected by this exception. See Kassover
v. UBS AG, 619 F. Supp. 2d 28, 33 (S.D.N.Y. 2008) (dismissing
IAA claim because plaintiffs failed to adequately plead that
defendant did not fall within exemption from definition of
investment adviser).

The parties agree that the most important precedent
governing this issue is Lowe v. SEC, 472 U.S. 181 (1985), and
therefore the Court discusses that case here at some length.
Lowe gave the Supreme Court occasion to interpret the IAA's

"exclusion for publishers." 472 U.S. at 205. The case began when the Securities and Exchange Commission ("SEC") accused petitioners Christopher Lowe ("Lowe") and three corporations of violating the IAA by "publishing two investment newsletters and soliciting subscriptions for a stock-chart service" without first registering as investment advisers. Id. at 184. Describing one of the publications at issue, the Supreme Court observed that it "contained general commentary about the securities and bullion markets, reviews of market indicators and investment strategies, and specific recommendations for buying, selling, or holding stocks and bullion." Id. at 185. Further, the publication "advertised a 'telephone hotline' over which subscribers could call to get current information," and it "was advertised as a semimonthly publication, but only eight issues were published in . . . 15 months." Id.

    The Supreme Court granted review to consider whether an injunction against the publication and distribution of the newsletters would be constitutional under the First Amendment, but the Court ended up resolving the case on statutory grounds. Id. at 211. Interpreting the IAA's publishers' exclusion, the Court observed that the provision "uses extremely broad language that encompasses any newspaper, business publication, or financial publication

provided that two conditions are met." Id. at 206. First, the publication must be "bona fide," and second, it must be "of regular and general circulation." Id. The Supreme Court further noted that

> [n]either of these conditions is defined, but the two qualifications precisely differentiate "hit and run tipsters" and "touts" from genuine publishers. Presumably a "bona fide" publication would be genuine in the sense that it would contain disinterested commentary and analysis as opposed to promotional material disseminated by a "tout." Moreover, publications with a "general and regular" circulation would not include "people who send out bulletins from time to time on the advisability of buying and selling stocks" or "hit and run tipsters."

Id. (citation omitted). Relying on legislative history, the Court used the terms "tipsters" and "touts" to refer to "unscrupulous" people who perpetrate "frauds and misrepresentations" upon the public. Id. at 199–200 (citation omitted) (quoting congressional report speaking of the "frauds and misrepresentations of unscrupulous tipsters and touts . . . who may solicit funds to be controlled, managed, and supervised" (citation omitted)); see also id. at 206 n.51 (stating that tipsters are people "who through newspaper advertisements offer to send, for a nominal price, a list of stocks that are sure to go up" (citation omitted)); id. at 209 (suggesting that a "tout" is a publication "tout[ing] a[] security in which [the publisher] ha[s] an interest").

Applying this construction of the statute to Lowe and the corporations, the Supreme Court held that Lowe's publications satisfied both conditions of the publishers' exclusion. The publications were "bona fide" because they were not "personal communications," did not "contain[] any false or misleading information," and were not "designed to tout any security in which [Lowe] had an interest." Id. at 209; see also id. at 206 (stating that the newsletters were "completely disinterested"). And despite that they had "not been 'regular' in the sense of consistent circulation," Lowe's publications were "of general and regular circulation" because there was "no indication that they ha[d] been timed to specific market activity, or to events affecting or having the ability to affect the securities industry." Id.; see also id. at 210 (stating that the "dangers of fraud, deception, or overreaching that motivated the enactment of the statute are present in personalized communications but are not replicated in publications that are advertised and sold in an open market" and that investment advisory contracts are marked by "fiduciary, person-to-person relationships"). Finally, the Court said it was "significant" that the SEC had "not established that petitioners . . . had authority over the funds of subscribers; that petitioners ha[d] been delegated decisionmaking authority to handle subscribers' portfolios or

accounts; or that there ha[d] been individualized, investment-related interactions between petitioners and subscribers." <u>Id.</u> at 210 n.57.

In the instant action, this Court finds that under the facts pleaded in the Complaint, Seeking Alpha is protected by the publishers' exclusion as expounded by <u>Lowe</u>. The publications alleged in the Complaint are not "personal communications," and Plaintiffs do not contend that they "contain[] any false or misleading information" or were "designed to tout any security in which [Seeking Alpha] had an interest." <u>Id.</u> at 209. Thus, Seeking Alpha's publications are "bona fide." <u>Id.</u> Further, the publications are "of regular and general circulation," as they are "advertised and sold in an open market" and are updated regularly. <u>Id.</u> at 210.

Plaintiffs contend that Seeking Alpha's publications are not of "general and regular circulation," (Opp'n at 12–13), but their argument is not persuasive. They ask the Court to read excerpts from <u>Lowe</u> hyperliterally and divorce them from their clear context.

For example, Plaintiffs say the Supreme Court "made clear" in <u>Lowe</u> that to qualify for the publishers' exclusion, the publisher's "advice must be 'offered to the general public on a regular schedule'" rather than "'issued from time to time in response to episodic market activit[y].'" (Opp'n at

12 (quoting <u>Lowe</u>, 472 U.S. at 206 & n.51).) Plaintiffs then point to allegations in the Complaint that supposedly support their contention that "Seeking Alpha's offerings and advice are not offered on any regular schedule." (<u>Id.</u> at 13.) Those allegations hold that: Seeking Alpha provides breaking news and critical market updates "day and night" (Compl. ¶ 22); that Seeking Alpha's "Quant Ratings" are reviewed each day and changed whenever market conditions dictate (see <u>id.</u> ¶ 31); that Seeking Alpha allows users to "stay connected to news and analysis" (<u>id.</u> ¶ 34); that subscribers receive email alerts each day regarding ratings changes and recommendations (see <u>id.</u> ¶ 36); that Seeking Alpha warns subscribers when stocks are at risk of performing badly (see <u>id.</u> ¶ 37); that subscribers can create screeners that "filter investment opportunities" and "update in response to market conditions and changed circumstances" (<u>id.</u> ¶¶ 41-42); and that subscribers can create custom stock comparisons (see <u>id.</u> ¶ 45).

The preceding allegations are insufficient to support a plausible inference that Seeking Alpha's publications are not "of general and regular circulation" as that phrase was construed in <u>Lowe</u>. Quite the contrary, the allegations establish that the publications *are* generally and regularly circulated. The allegations show (<u>see, e.g.,</u> Compl. ¶ 22)

that Seeking Alpha's stock investment data is updated daily and continuously, including in response to breaking news — which, of course, does not occur on a predictable schedule. Publications that, over a period of time, can be counted upon to be updated in response to breaking news — whenever such news occurs — fall within the ordinary usage of the term "regular." See Regular, Black's Law Dictionary (6th ed. 1990) ("Usual, customary, normal or general."); Regular, Oxford English Dictionary (2d ed. 1989)[2] ("Habitually or customarily used, received, observed, etc.: habitual, constant; *spec.* of a long-standing client or customer."). Plaintiffs appear to be asking the Court to adopt a rule providing that to qualify for the publishers' exclusion, a publication must be updated or circulated only at strictly measured, predictable intervals regardless of whether breaking news occurs in the meantime.[3] As Seeking Alpha argues, such a rule would make the exclusion inapplicable to virtually all modern financial news organizations, which publish breaking news and market updates in real time.

---

[2] Available at https://www.oed.com/oedv2/00201381 [https://perma.cc/HA75-2MTW] (last visited Aug. 14, 2024).

[3] Even if such a strict rule were to apply, the allegations in the Complaint suggest that some of Seeking Alpha's publications could meet it. (See Compl. ¶ 36 (stating that subscribers receive "daily portfolio summary email"); id. ¶ 31 (stating that Quant Ratings are reviewed each day).)

The Supreme Court in Lowe did not read the IAA so narrowly. See Lowe, 472 U.S. at 206 (stating that publishers' exclusion uses "extremely broad language"). The Court noted that Congress, in passing the IAA, was "plainly sensitive to First Amendment concerns" and "wanted to make clear that it did not seek to regulate the press through the licensing of nonpersonalized publishing activities." Id. at 204. And when applying the exclusion to Lowe himself, the Court held that his publications were of "regular circulation" even though they "ha[d] not been 'regular' in the sense of consistent circulation." Id. at 209.

It is true that the Supreme Court said Lowe's publications were "'regular' in the sense important to the securities market: there is no indication that they have been timed to specific market activity, or to events affecting or having the ability to affect the securities industry." Id. Plaintiffs latch onto such phrases in their opposition brief. (See Opp'n at 12-13 (arguing that publishers' exclusion does not cover communications "issued from time to time in response to episodic market activities" (citation omitted).)

But Plaintiffs strip these phrases of their context. In using this language, the Supreme Court was echoing Congress's concern with "frauds and misrepresentations of unscrupulous tipsters and touts . . . who may solicit funds to be

controlled, managed, and supervised." <u>Lowe</u>, 472 U.S. at 199–
200 (citation omitted); <u>see also id.</u> at 210 n.57 (stating it
was "significant" that Lowe did not have "authority over the
funds of subscribers"). Plaintiffs allege only "factual
information about past transactions and market trends" and
"commentary on general market conditions"; thus, "there can
be no doubt about the protected character of the[ir]
communications." <u>Id.</u> at 210.

Plaintiffs cannot escape the publishers' exclusion by
characterizing Seeking Alpha's publications as "customized,"
"personalized," and "individualized." (<u>E.g.,</u> Compl. ¶¶ 33–
37.) The Complaint does allege that by linking their
portfolios to the Premium Services, Seeking Alpha subscribers
can receive email alerts regarding ratings changes and
recommendations pertinent to their investments and warnings
that stocks in their portfolio are at risk of poor
performance. (<u>See id.</u>) But these features merely allow the
subscriber to filter generally available content that would
be visible to any subscriber who looks for it or who signs up
for the same alerts. That someone can create a unique filter
based on his or her own personal mix of investments does not
support a plausible inference that impersonal, disinterested,
and generally available content becomes individualized and

15

personal as soon as it is caught by the filter.[4] Plaintiffs do not allege that any of Seeking Alpha's articles, ratings, recommendations, or warnings was created specifically for Plaintiffs and delivered only to them. See Lowe, 472 U.S. at 210 (stating that communications that are "entirely impersonal" and not in the context of a "fiduciary, person-to-person relationship" are within the publishers' exclusion).

Plaintiffs rely on two other cases, neither of which is binding on this Court and both of which are distinguishable. The first case, SEC v. Park, involved a defendant who, "[t]hrough his advice to the thousands of members on his web site, . . . was essentially able to manipulate and affect the price of stocks he would buy and sell." 99 F. Supp. 2d 889, 892 (N.D. Ill. 2000). He posted "false and misleading performance results" and would "misrepresent that [his corporation] was buying a certain stock when it in fact already owned the stock or was selling it." Id. Further, he "never revealed any of his true interests in the stocks he was recommending to his members to buy and sell," and he "'touted' the stock of a certain company in exchange for

---

[4] Further, the Court is not bound to accept that Seeking Alpha's publications are "individualized" just because Plaintiffs labeled them as such. See Twombly, 550 U.S. at 545 (stating that a plaintiff must provide "more than labels and conclusions").

receipt of stock or other compensation from that company."
Id.

Plaintiffs cite Park for the proposition that daily publications are not "general and regular" under Lowe when they are timed to specific market activity or to events having the ability to affect the securities industry, see id. at 896, but they ignore the next sentence: "The SEC has alleged that Defendants sporadically disseminated their advice each day so as to take advantage of certain prices and inflate them *or to sell or purchase their own shares of a particular stock profitably*," id. (emphasis added). There is no similar allegation here. See Lowe, 472 U.S. at 210 (stating that Lowe's publications were protected because there was "no suggestion that they contained any false or misleading information, or that they were designed to tout any security in which petitioners had an interest").

Plaintiffs also rely on Weiss Research, Inc., IAA Release No. 2525, 88 SEC Docket 810, 2006 WL 1725099 (June 22, 2006), an SEC adjudication. There, the respondent newsletter publisher ("Weiss Research" or "Weiss") sent trading instructions to premium services subscribers "only when it purport[ed] to see an investment opportunity arise." Weiss Rsch. ¶ 4. Weiss Research helped potential subscribers "choose the premium service that was best for them" by

evaluating questionnaires completed by the potential subscribers and making customer service representatives available to answer questions. Id. ¶ 6. Weiss also offered an "auto-trading" service — "an arrangement in which premium services subscribers requested that Weiss Research send trading instructions directly to their broker-dealers for automatic execution." Id. ¶ 7. The SEC found that Weiss Research's auto-trading program did not qualify for the IAA's publishers' exclusion because "[u]nlike a typical newsletter, Weiss Research engaged in personalized communications with its subscribers regarding investment advice and effectively had investment discretion to purchase and sell securities on behalf of its auto-trading subscribers." Id. ¶ 22.

Again, there is no similar allegation here. Unlike the SEC in Weiss Research, Plaintiffs do not contend that Seeking Alpha "had authority over the funds of subscribers" or has "been delegated decisionmaking authority to handle subscribers' portfolios or accounts." Lowe, 472 U.S. at 210 n.57. Weiss Research and Park are thus easily distinguishable from this case and only confirm that Lowe protects the alleged publications at issue here.

In sum, Plaintiffs have not met their burden to plead facts sufficient to support a plausible inference that Seeking Alpha operated as an investment adviser and was not

protected from registration by the IAA's publishers' exclusion. The Court therefore **GRANTS** Seeking Alpha's motion to dismiss.[5]

Plaintiffs ask in the alternative for leave to amend the Complaint. (<u>See</u> Opp'n at 25.) Seeking Alpha did not respond to this request in its reply brief. As there has been no prior amendment of the Complaint, the Court grants Plaintiffs' request to amend the Complaint. <u>See</u> Fed. R. Civ. P. 15(a)(2); <u>Piuggi v. Good for You Prods. LLC</u>, --- F. Supp. 3d ----, No. 23 Civ. 3665, 2024 WL 3274638, at *16 (S.D.N.Y. July 2, 2024) (stating that it is "rare that leave should be denied, especially when there has been no prior amendment" (citation omitted)).

## IV.   <u>ORDER</u>

For the reasons stated above, it is hereby

**ORDERED** that the motion (<u>see</u> Dkt. No. 29) of defendant Seeking Alpha, Inc. to dismiss the complaint of plaintiffs Matthew Lingley and Sandy Papadopoulos (together "Plaintiffs") pursuant to Federal Rule of Civil Procedure 12(b)(6) is hereby **GRANTED**; and it is further

---

[5] In light of its conclusion with respect to the publishers' exclusion, the Court need not reach Seeking Alpha's additional arguments for dismissal.

**ORDERED** that Plaintiffs are hereby granted leave to file an amended complaint within thirty (30) days of the date of this Decision and Order; and it is further

**ORDERED** that the Clerk of Court is respectfully directed to terminate the pending motion in this matter at Docket No. 29.

**SO ORDERED.**

Dated:    15 August 2024
          New York, New York


_____
                    Victor Marrero
                    U.S.D.J.